*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-2060

PATRICK D. QUINLAN, SR.,

*Defendant-Appellant.*

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-80514—Nancy G. Edmunds, District Judge.

Argued: October 31, 2006

Decided and Filed: January 5, 2007

Before: CLAY and SUTTON, Circuit Judges; SHARP, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Carole M. Stanyar, Detroit, Michigan, for Appellant. Stephen L. Hiyama, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Carole M. Stanyar, Detroit, Michigan, for Appellant. Stephen L. Hiyama, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge. Patrick Quinlan pleaded guilty to making false statements to the Securities and Exchange Commission (SEC) and to conspiring with others to commit a federal crime. After rejecting Quinlan's request to withdraw his guilty plea, the district court imposed a 120-month sentence and ordered him to pay $256,643,608 in restitution. As the district court did not commit reversible error in rejecting Quinlan's request to withdraw his guilty plea or in sentencing him, we affirm.

---

[*] The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

I.

From 1991 through January 1999, Quinlan served as the CEO of Mortgage Corporation of America Financial Corporation, otherwise known as MCA. Among other things, MCA engaged in mortgage banking.

During these years, Quinlan "directed and participated in the raising of funds to finance the operations of the MCA enterprise," relying on three principal sources: "investors who purchased MCA securities; warehouse lenders; and the Policemen and Firemen Retirement System of the City of Detroit." Plea at 3. Quinlan "knowingly conspired with other employees, officers and directors of MCA to obtain these funds by means of false and fraudulent pretenses, representations, and promises." Plea at 3.

MCA filed quarterly reports during this time that Quinlan knew "contained materially false and fraudulent statements and concealed material facts" from the SEC. Plea at 6. Through his various positions with MCA (in addition to being the CEO, he was the chairman of the board and a member of the five-person financial management committee), Quinlan was responsible for "all significant financial decisions for the MCA enterprise, including decisions to deliberately engage in business and accounting practices that were fraudulent." Plea at 7.

On January 22, 1999, MCA's bankers stopped lending money to the company, which led to the demise of MCA. Within one week, the Michigan Financial Institutions Bureau appointed a conservator to assess and limit the scope of the impending financial disaster. And on February 10, the conservator filed a bankruptcy petition on behalf of MCA, after which the court liquidated MCA's assets. All told, MCA's lenders and investors lost in excess of $256 million.

In June 2002, a grand jury indicted Quinlan (and two other individuals) for committing mail, wire and bank fraud, making false statements to the SEC and conspiring with others to commit each of these federal crimes. On February 24, 2004, Quinlan signed a plea agreement in which he pleaded guilty to the false-statement and conspiracy charges. The government and Quinlan agreed with all but one of the sentencing calculations applicable to his case, prompting them to spell out two potential guidelines ranges under the plea agreement: (1) a range of 87–108 months if the district court found that Quinlan did not receive more than $1 million in profit, *see* U.S.S.G. § 2F1.1(b)(7)(B) (1999) (current version at U.S.S.G. § 2B1.1 (2006)), and (2) a range of 135–168 months if the district court found that he received more than $1 million in profit.

Three months later, the federal public defender's office filed a motion to withdraw as counsel based on a previously undisclosed conflict of interest. The district court granted the motion and appointed another attorney—Quinlan's third lawyer, as his first counsel withdrew when Quinlan did not pay his bills—for the limited purpose of representing Quinlan at sentencing. A few months later, the new counsel moved to withdraw because Quinlan asked to withdraw his guilty plea, a legal strategy that exceeded the attorney's agreed-upon scope of representation. The court granted the attorney's request to withdraw on December 15, 2004. On December 21, the court appointed still another lawyer (his fourth) to serve as Quinlan's counsel; and on April 5, 2005, Quinlan filed a motion to withdraw his guilty plea through his new counsel.

After conducting a hearing on Quinlan's motion to withdraw his plea, the court denied the motion.

At Quinlan's sentencing hearing, the district court found that the enhancement for receipt of more than $1 million in profit, *see* U.S.S.G. § 2F1.1(b)(7)(B), did not apply. Sentencing at 17. Treating the guidelines range of 87–108 months as advisory, *see United States v. Booker*, 543 U.S. 220 (2005), the district court explained that an above-guidelines variance was appropriate. It

sentenced Quinlan to 120 months' imprisonment and ordered him to pay over $256 million in restitution to MCA's investors and lenders.

## II.

Quinlan initially argues that the district court should have permitted him to withdraw his guilty plea. Once a district court accepts a guilty plea after a proper Rule 11 hearing, a defendant may withdraw from the plea agreement only when he presents the court with a "fair and just reason for requesting the withdrawal." Fed. R. Crim. Pro. 11(d)(2)(B). We review a district court's rejection of such a motion for "abuse of discretion." *United States v. Denkins*, 367 F.3d 537, 544 n.3 (6th Cir. 2004); *see United States v. Pluta*, 144 F.3d 968, 973 (6th Cir. 1998).

To determine whether a defendant offered a "fair and just reason" for withdrawing a plea, we consider: "(1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted." *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994). These considerations represent "a general, non-exclusive list and no one factor is controlling." *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996).

The district court acted within its discretion in concluding that the application of these factors did not entitle Quinlan to withdraw from the plea agreement. First, a considerable period of time—13 months—lapsed between Quinlan's guilty plea and his motion to withdraw, undermining his claim that a sincere change of heart, rather than an expedient change in strategy, prompted the motion. In upholding district court decisions rejecting plea-withdrawal motions, we have noted that far shorter periods of time represented the most significant factor in support of the district court's decision. *See, e.g.*, *United States v. Durham*, 178 F.3d 796, 798–99 (6th Cir. 1999) (noting that a delay of 77 days was the strongest factor supporting the district court's denial); *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (noting that a delay of 67 days was the strongest factor supporting the district court's denial); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (noting that a delay of 55 days was the strongest factor supporting the district court's denial); *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (noting that a delay of 22 days was the strongest factor supporting the district court's denial).

Second, Quinlan has not offered a legitimate explanation for such a lengthy delay. Attempting to show otherwise, he notes that he had two changes of counsel after the guilty plea, one of which arose from a conflict of interest in his representation. But the circumstances underlying each change in counsel do not advance Quinlan's argument. One month after Quinlan signed the plea agreement, the federal public defender's office learned that a different division of the office had represented individual homeowners whose mortgages had been affected by the MCA collapse, leading the office to withdraw from the representation. But Quinlan has not shown how this conflict affected his decision to plead guilty. Nor in this case is it clear how this kind of conflict could have impacted his decision to enter the plea. Six months after learning of this conflict and more than two months after his second attorney had been appointed, he pleaded guilty to similar charges under state law.

The withdrawal of his second attorney does not change matters. His second attorney filed a motion to withdraw as counsel nine months after Quinlan signed the plea agreement because he had agreed to represent Quinlan on a limited basis, namely to represent him at sentencing. When Quinlan asked him instead to file a motion to withdraw the guilty plea, he explained that this request

was inconsistent with his terms of engagement. Nothing about the withdrawal of this counsel offers any justification for Quinlan's decision not to file a more contemporaneous plea-withdrawal motion.

Third, Quinlan's motion does not turn on a sudden decision to assert his innocence. So far as the record shows, Quinlan sought to withdraw his guilty plea simply because he wanted more favorable treatment at sentencing. *See, e.g.*, JA 337 (telling his attorney that "I wanted to plead guilty straight up to all Counts, and have a mini-trial just on the sentencing guidelines"); JA 357 (telling his attorney that "it was only . . . Judge Edmunds'[] unwillingness to provide me with new counsel in the sentencing phase that kept me from pleading guilty straight up").

Fourth, nothing about the circumstances of the plea suggests that he should be able to withdraw the plea 13 months after he entered it. To the contrary, at his Rule 11 hearing, Quinlan acknowledged: that he "underst[ood] the elements of the offenses," Plea Hr'g at 14; that he "believe[d] that in fact [he was] guilty of those offenses," *id.*; that no one "made any other or different promise in an effort to induce [him] to plead guilty," *id.* at 16; that he was "pleading guilty freely and voluntarily because in fact [he was] guilty and it [was his] choice to plead guilty," *id.* at 17; and that he had both read and agreed "with the Rule 11 agreement and the factual basis that accompanie[d] it," *id.* at 18. To this day, we do not know why these statements do not remain true.

Fifth, Quinlan's background as a sophisticated and successful businessman confirms that there is no reason to think that he would have misunderstood the plea agreement or the consequences of signing it.

Sixth, while Quinlan did not have any prior experience with the criminal justice system, his educational background suggests that he should have understood the consequences of the plea agreement.

Seventh, Quinlan's motion, if granted, would have prejudiced the government. He filed his motion one month before his sentencing hearing and two months before the sentencing of his co-defendant. "The withdrawal of the plea in these circumstances," the district court explained, "would cause either a delay in the trial of [his co-defendant], or require the government to try the two cases separately, despite the virtual unity of witnesses and exhibits." JA 526. Quinlan in the end has not provided a "fair and just reason" for his request to withdraw his guilty plea, let alone given us "a definite and firm conviction that the [district court] committed a clear error of judgment." *United States v. Frost*, 914 F.2d 756, 764 (6th Cir. 1990) (internal quotation marks omitted).

Quinlan offers several contrary arguments, all unpersuasive. He first contends that the government breached the plea agreement. As he understood the plea agreement, it meant that if he showed that the fraud resulted in not more than $1 million in profit, he would be sentenced within the plea agreement's guidelines range of 87–108 months; and if the government showed that he received more than $1 million in profit, he would be sentenced within the plea agreement's (higher) guidelines range of 135–168 months.

The plea agreement itself, however, acknowledged that the government could seek, and the court could impose, a 120-month sentence—the precise sentence Quinlan received. One section of the agreement acknowledged that the "Defendant understands that the government will not move for or recommend a sentence of less than 120 months," Plea at 10, and another provision acknowledged that the district court "may not impose a term of imprisonment that exceeds *120 months*," *id.*

What made it easier for the district court to sentence Quinlan above the 87–108 month guidelines range of course was *Booker*, which the Supreme Court decided after the parties entered into the plea agreement. No doubt, it might have been difficult before *Booker* for the government to recommend (and the court to grant) a 120-month sentence once the district court resolved the

guidelines-enhancement dispute against the government. But the change in law brought about by *Booker* does not make Quinlan's plea any less voluntary or the government's conduct in enforcing the plea agreement any less proper. "[W]here developments in the law later expand a right that a defendant has waived in a plea agreement, the change in law does not suddenly make the plea involuntary or unknowing or otherwise undo its binding nature. A valid plea agreement, after all, requires knowledge of existing rights, not clairvoyance. Absent misrepresentation or other impermissible conduct by state agents, . . . a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *United States v. Bradley*, 400 F.3d 459, 463 (6th Cir. 2005) (internal quotation marks omitted). The government no more acted improperly in invoking *Booker* to seek an upward variance than a criminal defendant would act improperly in invoking the decision to seek a downward variance.

Equally unavailing is Quinlan's related argument that the government's reliance at sentencing on his involvement in the insolvency of the U.S. Mutual Savings & Loan Association demonstrates that the government breached the plea agreement. Once again, the plea agreement placed limitations on the parties' positions at sentencing with regard to departures under a mandatory guidelines system, not variances under an advisory guidelines system. The district court not only had authority to consider Quinlan's past involvement with insolvent financial institutions in determining whether to impose an upward or downward variance after *Booker*, but it also had an obligation to do so. *See* 18 U.S.C. § 3553(a)(1) (requiring courts to consider the "circumstances of the offense and *the history* and characteristics of the defendant") (emphasis added).

Quinlan further argues that the district court violated the notice provisions of Rule 32(h) of the Federal Rules of Criminal Procedure in sentencing him. The courts of appeals are riven over whether Rule 32(h) applies to upward sentencing variances in the same way that it has always applied to upward sentencing departures. *Compare United States v. Vampire Nation*, 451 F.3d 189, 195–96 (3d Cir. 2006) (holding that Rule 32(h) does not apply to sentencing variances); *United States v. Walker*, 447 F.3d 999, 1007 (7th Cir. 2006) (same); *United States v. Long Soldier*, 431 F.3d 1120, 1122 (8th Cir. 2005) (same); *and United States v. Irizarry*, 458 F.3d 1208, 1212 (11th Cir. 2006) (same); *with United States v. Davenport*, 445 F.3d 366, 371 (4th Cir. 2006) (holding that Rule 32(h) applies to sentencing variances); *United States v. Evans-Martinez*, 448 F.3d 1163, 1167 (9th Cir. 2006) (same); and *United States v. Dozier*, 444 F.3d 1215, 1217–18 (10th Cir. 2006) (same). In *United States v. Cousins*, No. 05-3228, 2006 U.S. App. LEXIS 29390, (6th Cir. Nov. 30, 2006), our court recently sided with the circuits holding that Rule 32(h) "applies equally to Chapter 5 departures and to §3553(a) variances." *Id.* at *21.

The application of Rule 32(h) to Quinlan's sentencing, however, makes no difference here because the government satisfied its requirements. The rule says that "[b]efore the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report *or in a party's prehearing submission*, the court must give the parties reasonable notice that it is contemplating such a departure." (emphasis added). In both its sentencing memorandum and its amended sentencing memorandum, the government put Quinlan and the court on notice that it was recommending a sentence of 120 months. By its terms, in short, the rule does not assist Quinlan.

Quinlan, finally, claims that his fourth counsel provided ineffective assistance at the sentencing hearing. (He has a fifth counsel on appeal.) As is our custom, we generally do not review such claims on direct appeal, preferring that the defendant raise such claims (if at all) in a § 2255 petition. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (observing that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance"); *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) ("As a general rule, a

defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal . . . ."). Quinlan has offered no good reason for diverging from that practice here.

III.

For these reasons, we affirm.