**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0267n.06
Filed: May 16, 2008

Nos. 06-1026/06-1027/07-1081

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| OZRO GRAHAM, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant (No. 06-1026), | ) | |
| | ) | |
| RILEY TROY GRAHAM, | ) | |
| | ) | |
| Defendant-Appellant (No. 06-1027), | ) | |
| | ) | |
| BRYON JONES, | ) | |
| | ) | |
| Defendant-Appellant (No. 07-1081). | ) | |

Before: COLE, GIBBONS, and ROGERS, Circuit Judges.

**Rogers, Circuit Judge.** This consolidated appeal involves three defendants who were involved in a large-scale cocaine distribution and money-laundering ring. Nineteen individuals were indicted for their participation in the drug ring, but only three — Riley Troy Graham, Ozro Graham, and Bryon Jones — are parties to this appeal. Of these three, only Jones went to trial. He was convicted of conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841 and § 846, as well as conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956. Riley Troy Graham, the leader of the criminal organization, entered into a plea agreement and pled guilty

to engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, and conspiring to

launder monetary instruments in violation of 18 U.S.C. § 1956. Ozro Graham, Riley Troy Graham's

brother, also entered into a plea agreement. He pled guilty to the same offenses of which Jones was

convicted. On appeal, each of the defendants argues that his convictions should be vacated. Because

their arguments are unavailing, however, the defendants' convictions are affirmed.

I.

This case arose out of an elaborate drug distribution and money-laundering ring that operated

throughout the 1990's in Michigan, California, Tennessee, West Virginia, Ohio, Pennsylvania,

Georgia, and Saint Lucia, West Indies. The organization was led by Riley Troy Graham and was

centered in Detroit, Michigan. Graham and his associates initially conducted their operation by

acquiring cocaine in California, hiding it inside candles, and shipping it to Michigan via private

delivery companies like UPS. Various seemingly legitimate businesses were used as fronts for the

operation. In particular, a business known as "The Business and Postal Center," located in Beverly

Hills, California, was used to facilitate the shipment of the drugs. Companies known as "Active

Wear" and "B&B Wholesale" were also used as fronts. After the DEA learned that the organization

was shipping cocaine in candles, however, the conspirators were forced to change their business

model. As a result, the hub of the operation was moved to Nashville, Tennessee, and Riley Troy

Graham started a trucking company that was then used to ship cocaine across the country. Graham's

organization made illicit profits on the order of millions of dollars and even tried to use some of the

profits to develop the first casino resort on Saint Lucia.

On July 8, 2003, Riley Troy Graham and eighteen of his associates — including Bryon Jones and Ozro Graham — were named in an indictment charging them with numerous offenses stemming from their criminal enterprise. The facts pertaining to Jones and the Graham brothers are discussed individually below.

A. Defendant Bryon Jones

Bryon Jones first met Riley Troy Graham in the late 1980's. In 1994, Jones moved from Detroit, Michigan, to Los Angeles, California. Later that year, he purchased The Business and Postal Center in Beverly Hills for $20,000. Jones does not deny his ownership of The Business and Postal Center, nor does he deny the existence of the conspiracy to distribute drugs and launder money. Instead, he claims that he was not a part of the conspiracy. Jones purports to have been nothing more than an absentee owner whose business was used for drug trafficking without his knowledge. At trial, however, that claim was refuted. A co-defendant named Julia Carter identified Jones as an active participant in the conspiracy, and another co-defendant, Kyle Stevens, also provided testimony linking Jones to the conspiracy.

Jones' absentee-owner strategy ultimately proved fruitless, as the jury convicted him of conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841 and § 846, as well as conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956. He was subsequently sentenced to 240 months in prison. Jones now asks this court to vacate his conviction and remand the case for re-trial on the ground that the district court committed plain error by

admitting testimonial hearsay evidence in violation of the Confrontation Clause, and on the ground

that the variance between the allegations in the indictment and the proof presented at trial amounted

to a constructive amendment of the indictment.

Jones' Confrontation Clause argument arises from the district court's admission of hearsay

evidence through the testimony of DEA Agent Mark German. Specifically, Jones protests the

district court's admission of hearsay statements made by: (1) Allen Phillips, who sold The Business

and Postal Center to Jones; (2) Wayne Parker, who rented a house in Los Angeles to a different

member of the conspiracy; (3) government agents who informed Agent German of the circumstances

surrounding the interception of packages containing drugs and money; (4) security guards who

worked at an apartment complex that was suspected of being the home of individuals involved with

the conspiracy; and (5) Detective Milligan of the Los Angeles Police Department. Jones concedes

that the plain error standard applies to his Confrontation Clause argument because he did not object

to this evidence during the trial. A description of the hearsay declarants and the content of the

objected-to evidence is provided below.

i. Hearsay Statements of Allen Phillips

Agent German testified that Allen Phillips told him that Phillips had sold The Business and

Postal Center to Jones — who was using the alias Brian Simms — for $20,000. Agent German also

said that Phillips told him that Jones had said that his address was 9811 Delco in Chatsworth,

California. Agent German further said that an individual using the name Troy Williams — which

was an alias used by Riley Troy Graham — had told Phillips that he, rather than Jones, was actually the owner of The Business and Postal Center.

### ii. Hearsay Statements of Wayne Parker

Wayne Parker was the owner of the house at 9811 Delco in Chatsworth, California. Agent German testified that Parker told him that Parker had rented the house to Leon Smith, a co-defendant in this case whose charges were dropped because he was found incompetent to stand trial. Agent German also said that Parker told him that Leon Smith had abandoned the house in April of 1995, which roughly coincided with the Government's interception of a shipment of drugs going to Michigan and a shipment of money going to California.

### iii. Hearsay Statements of Agents Involved in the Interception of Packages

Agent German testified that on October 29, 1994, Agents Charles Bazzy and Kristen Denard intercepted a package at the Airborne Express facility in Oakland County, Michigan. The package was being sent from Active Wear to B&B Wholesale located at 9811 Delco in Chatsworth, California. Agent German further testified that a search warrant was obtained for the package after a canine inspection indicated that it contained drugs. When the box was opened, however, the agents found that it only contained candles and articles of clothing.

Agent German also testified about a package that was seized by Agents James Lightfoot and Gary Jones in April of 1995 at a UPS facility in Detroit. German testified that the package was being

sent to an address in Detroit from B&B Wholesale in California. He further stated that agents discovered that the return address in California was fictitious, and that a canine inspection indicated that the package contained drugs. After the agents obtained a search warrant, the package was opened, and it was found to contain a candle. Agent Lightfoot then dug into the candle and discovered that cocaine was hidden inside it.

Finally, Agent German testified that Agent Charles Bazzy intercepted a package at the Airborne Express facility. The package contained a candle, inside of which was hidden $15,040 in cash. The package was being sent from Active Wear to 8693 Wilshire Boulevard, Beverly Hills, California, which was the address of The Business and Postal Center.

### iv. Hearsay Statements of Apartment Complex Security Guards

Agent German testified that he went to an apartment complex in which some members of the conspiracy were suspected to be living. Upon arriving at the complex, he asked the security guards to ascertain the names of everyone inside a particular apartment. The security guards complied and informed him that the apartment was inhabited by Kelly, Leon, and a female who did not identify herself. Agent German insinuated that Kelly and Leon were in fact Kelly Terrell and Leon Smith, two members of the conspiracy.

v. Hearsay Statements of Detective Milligan

Agent German testified that he was informed by Detective Milligan that a canine inspection in Los Angeles had uncovered a drug-laden package headed for Detroit. He further said that Detective Milligan told him that a search warrant was obtained in California, and that the package was found to contain cocaine encased in candles. Additionally, Agent German testified that the package had been sent from a Mailboxes, Etc. store, not The Business and Postal Center.

B. Defendant Riley Troy Graham

Shortly before his trial was set to begin in May of 2005, Riley Troy Graham received an offer of a plea agreement from the Government. By its own terms, the offer was set to expire at 2:00 P.M. on May 25, 2005. Graham attempted to communicate his acceptance of the offer "late on May 25, 2005," which presumably means that he attempted to accept it after the 2:00 deadline. On May 26, 2005, Riley Troy Graham, his lawyer, and three Assistant United States Attorneys all signed the plea agreement. Graham then went before the district court to plead guilty to engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, and conspiring to launder monetary instruments in violation of 18 U.S.C. § 1956. The district court conducted a meticulous plea colloquy in order to determine that Graham understood the significance of a guilty plea as well as the significance of the rights that he was waiving. Graham was also subjected to careful questioning by the district court and the Government to ensure that there was a factual basis for his plea.

On September 26, 2005, exactly four months after entering his plea, Graham filed a pro se motion to withdraw it. The sole reason asserted in his motion was that the plea was based on an invalid plea agreement. According to Graham, his plea agreement was invalid because it was signed one day after the expiration of the Government's original written offer of a plea agreement. Graham's motion was heard prior to his sentencing hearing on November 22, 2005. At that hearing, Graham's standby counsel also asked the district court for a continuance so that Graham could have more time to reply to the Government's response to his motion, and so that Graham could supplement his motion with newly discovered evidence. The district court refused to allow Graham to withdraw his plea and denied his request for a continuance. After denying those requests, the district court sentenced Graham to 240 months in prison.

At oral argument before this court, Riley Troy Graham's counsel, Kevin Schad, notified the court that he had become aware of information that would prevent him from ethically moving forward with the arguments raised in the brief that he had filed on his client's behalf. As a result, he informed the court that he would be submitting a motion to withdraw the brief. Mr. Schad filed his motion shortly thereafter, and this panel construes that motion as a motion to withdraw as counsel as well as a motion to withdraw the brief.

## C. Defendant Ozro Graham

On May 26, 2005, Ozro Graham pled guilty to conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841 and § 846, as well as conspiracy to launder monetary

instruments in violation of 18 U.S.C. § 1956. At the plea hearing, the district court went to great lengths to ensure that there was a factual basis for Ozro Graham's plea and to guarantee that he understood what he was doing. The district court carefully informed Graham of the rights that he was waiving and the consequences of waiving those rights, and Graham indicated clearly that he understood the significance of his guilty plea. Graham also testified that no one had threatened him or forced him to plead guilty, and that although he was taking medication for depression, he completely understood everything that was happening. Finally, Graham provided a factual basis for his plea by testifying that he had helped his brother distribute cocaine in Michigan and Tennessee and had also laundered the proceeds in various manners so as to conceal the source of the money.

On September 26, 2005, Ozro Graham also sought to withdraw his guilty plea. Even though he was represented by counsel, he decided, like his brother, to take matters into his own hands by filing a pro se motion to withdraw his plea. His motion adopted the reasoning set forth in his brother's pro se motion — i.e., that the plea agreement was invalid since it was entered into after the original offer from the Government had expired. A few weeks later, on October 11, 2005, Ozro Graham's counsel filed another motion seeking to withdraw Ozro Graham's guilty plea. That motion did not rely on the invalid-plea-agreement argument that Ozro Graham had made in his pro se motion.[1] Instead, it claimed that Ozro Graham had been pressured into pleading guilty by his family because of the fact that the generous plea bargain offered to Riley Troy Graham was

---

[1]Other than in his pro se motion, Ozro Graham has never mentioned the invalid plea agreement argument that his brother relies on. It is not part of his argument on appeal.

contingent on Ozro Graham's also pleading guilty. The motion also alleged that Ozro Graham had notified his attorney that he wanted to withdraw his plea shortly after entering it, but that his attorney had counseled against doing so.

The district court rejected Graham's motion. Among the factors that the judge found to weigh against Graham were the length of time between the plea and the motion, the unusual amount of time that the district court took with the plea colloquy, and Graham's previous experience with the criminal justice system. The district court also found that Graham understood what he was doing when he entered his plea and was not under duress. After denying Graham's motion, the district court sentenced him to 210 months in prison.

## II.

The defendants' arguments are without merit. First, there is no merit to Jones's claim that there was a constructive amendment of the indictment. The presentation of evidence at trial did not alter the terms of the indictment in such a way that Jones was convicted of an offense for which he was not charged. *See United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007) (quoting *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003)). Jones claims that there was a constructive amendment because the Government offered proof at trial that Jones and his co-defendants had conspired *together*, while the indictment alleged that they had conspired with "various people," instead of with *each other*. This argument is contrary to Sixth Circuit precedent, which holds that the language used in Jones' indictment was sufficient to notify Jones and his co-defendants that they

had been charged with conspiring among themselves.  *See United States v. Reed*, 721 F.2d 1059,

1061-62 (6th Cir. 1983) (citing *Hamling v. United States*, 418 U.S. 87 (1974)).

Jones' Confrontation Clause argument is also without merit.  Jones correctly admits that the

plain error standard applies to his Confrontation Clause objections because he failed to raise them

at trial.  *See United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007) (citing *United States v.*

*Evans*, 883 F.2d 496, 499 (6th Cir. 1989)).  The plain error standard is met if the appellant can show

that there is: (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously

affects the fairness, integrity, or public reputation of judicial proceedings.  *See United States v.*

*Arnold*, 486 F.3d 177, 194 (6th Cir. 2007) (quoting *United States v. Cotton*, 535 U.S. 625, 631

(2002)).  The third and fourth elements of that standard are absent here.

The third element cannot be satisfied unless the error "affected the outcome of the district

court proceedings."[2]  *Cotton*, 535 U.S. at 632 (quoting *United States v. Olano*, 507 U.S. 725, 734

(1993)).  Jones cannot prevail on this element because he has not demonstrated that he would have

been acquitted but for the admission of the objected-to hearsay evidence.  To the contrary, Jones

almost certainly would have been convicted regardless of whether the jury had heard that evidence.

The testimony of Julia Carter, who was an active participant in the drug ring, provided a sufficient

---

[2]Only "structural errors" can be corrected regardless of their impact on the outcome.  *See*
*United States v. Cotton*, 535 U.S. 625, 632 (2002).  The alleged Confrontation Clause errors are not
structural errors.  *See Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (defining "structural
error" and listing those errors that have previously been designated as structural).  Therefore, Jones
must demonstrate prejudice in order to satisfy the third prong of the plain error standard.

quantity of evidence against Jones that he probably would have been convicted on that evidence alone. Carter testified that Riley Troy Graham enlisted her help in purchasing cocaine in California and preparing it for shipment to Michigan. She further testified that Jones, who was then using the alias Brian Simms, helped facilitate her purchases of cocaine and provided some of the equipment that was used to prepare the cocaine for shipment. Describing in detail the methods by which the cocaine smuggling operation was carried out, she testified that Riley Troy Graham would contact her whenever he needed a shipment of cocaine. He would then wire money to several individuals in California, and Carter would collect the money from them. After collecting the money, she would go to Jones' house, and he would be expecting her even though she had not informed him that she was coming or otherwise contacted him in any way. Once Carter arrived at Jones' house with the money, Jones would arrange for the cocaine supplier to come to his house as well. Jones would then take the money from Carter and negotiate a purchase of at least a kilogram of cocaine. After the drugs were acquired, Carter would take them to Jones' garage, which housed a one-ton press. Using the press, Carter would make the drugs into cocaine "hockey pucks" that could then be covered with wax and made to look like an ordinary candle so that they could be shipped to Michigan. The candles were shipped from the Business and Postal Center in Beverly Hills, which Jones admits to owning.

On top of Julia Carter's testimony, the testimony of Kyle Stevens also indicates that Jones was a member of the conspiracy. Stevens, a cousin of Riley Troy Graham, was also a member of the conspiracy. Stevens used his position as a UPS deliveryman to assist Graham's criminal

enterprise. His job was to ensure that packages of cocaine being sent from California arrived safely at their destinations in Michigan. Stevens testified that Graham would have drugs sent to addresses on Stevens' regular delivery route and that Graham would alert Stevens when a package was on its way. It would then be Stevens' job to deliver the package to a location selected by Graham. Stevens further testified that Bryon Jones once accepted delivery of a package of cocaine at a designated delivery point. The combination of this evidence with Julia Carter's very condemning testimony strongly indicates that Jones was a member of the drug-dealing and money-laundering conspiracy and would have been convicted regardless of whether the jury heard the objected-to hearsay evidence. Thus, the testimony given by Carter and Stevens belies any argument that Jones was prejudiced by the hearsay evidence.

This conclusion is supported by the fact that the hearsay evidence has almost no relation to Jones. For the most part, it simply confirms the existence of the conspiracy, which Jones did not dispute to begin with. At worst, the evidence might have bolstered the Government's case in an inconsequential way by virtue of the fact that it is consistent with the rest of the Government's proof. Because the objected-to evidence has so little bearing on Jones' guilt, and because Carter and Stevens provided such inculpatory testimony against Jones, it is almost certain that the hearsay made no difference in the outcome of the trial. Therefore, Jones has not satisfied his burden of proving that the alleged errors affected any substantial rights. *See United States v. Stonefish*, 402 F.3d 691, 699 (6th Cir. 2005) (quoting *United States v. Lowenstein*, 1 F.3d 452, 454 (6th Cir. 1993)).

- 13 -

Even if Jones could satisfy the third element of the plain error standard, however, his claim would still founder on the fourth element. Given that there was so much legitimately admitted evidence of Jones' guilt, the alleged errors surely did not harm the fairness, integrity, or public reputation of the judicial proceedings, even if they were in fact plain errors. To the contrary, reversing Jones' conviction on the basis of evidentiary errors that were not objected to at trial would probably have the effect of harming the fairness, integrity, or public reputation of the judicial proceedings. *See Johnson*, 520 U.S. at 470 (citing R. Traynor, The Riddle of Harmless Error 50 (1970)).

Next, the district court properly refused Riley Troy Graham's request to withdraw his guilty plea. Graham was not entitled to withdraw his plea because he had not shown a fair and just reason for requesting the withdrawal. *See* Fed. R. Crim. P. 11(d)(2)(B). The only reason that Graham has put forth for withdrawing his guilty plea is that it was based on an invalid plea agreement. He claims that the agreement was void for the sole reason that he and the Government signed the agreement on May 26, 2005, one day after the Government's initial written offer of a plea agreement had expired. This argument lacks merit because the expiration of an offer does not preclude the parties from coming to an agreement thereafter, as happened in this case.

Plea agreements are interpreted according to principles of contract law. *See United States v. Luske*, 286 F.3d 906, 909 (6th Cir. 2002) (citing *United States v. Robinson*, 924 F.2d 612, 613 (6th Cir. 1991)). Under the principles of contract law, Riley Troy Graham's attempt to accept the Government's offer after its expiration is considered a counteroffer, which the Government was free

to accept or reject. *See Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981); Restatement (Second) of Contracts § 70 (1981); 17A Am. Jur. 2d *Contracts* § 76 (2004). Because the signature of the Assistant United States Attorney on the plea agreement is a manifestation of the Government's assent to the terms of the proposed agreement, it is clear that the government did indeed accept the counteroffer, thereby creating a valid plea agreement. *See* Restatement (Second) of Contracts § 50 (1981). Considering that Graham's plea agreement was valid, his sole ground for challenging his plea is baseless. Therefore, the district court properly refused to permit Graham to withdraw his guilty plea.

The district court's refusal to grant a continuance at Riley Troy Graham's sentencing hearing also does not warrant reversal. Such a ruling is reviewed for abuse of discretion, and in order for this court to reverse the district court, Graham would have to "show that the denial resulted in actual prejudice to his defense." *United States v. Crossley*, 224 F.3d 847, 855 (6th Cir. 2000). "'Actual prejudice' is established 'by showing that a continuance would have made relevant witnesses available or added something to the defense.'" *Id.* (quoting *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997)). Although Graham asserts that a continuance would have allowed him to present newly discovered evidence and additional arguments, he has not identified with specificity any evidence or argument that he would have presented had the continuance been granted. Thus, because he has not shown any actual prejudice, it cannot be said that the district court abused its discretion.

Finally, the district court properly refused to allow Ozro Graham to withdraw his guilty plea. That decision was not an abuse of discretion because Ozro Graham also failed to show a fair and just

reason for requesting the withdrawal. *See* Fed. R. Crim. P. 11(d)(2)(B). In determining whether a defendant has shown a fair and just reason, this court generally considers the following factors:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*United States v. Quinlan*, 473 F.3d 273, 276-77 (6th Cir. 2007) (quoting *United States v. Bashara*, 27 F.3d 1174, 1180-81 (6th Cir. 1994)). These factors "represent 'a general, nonexclusive list and no one factor is controlling.'" *Id.* at 277 (quoting *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996)). Because this court reviews the district court's decision for abuse of discretion, *see Quinlan*, 473 F.3d at 276, reversal is warranted only if the district court's analysis of the relevant factors gives this court "'a definite and firm conviction that the [district court] committed a clear error of judgment.'" *Id.* at 278 (quoting *United States v. Frost*, 914 F.2d 756, 764 (6th Cir. 1990)). That standard is not met here.

A factor that weighs against Graham is the length of time that elapsed between his plea and the filing of his motion to withdraw it. Graham pled guilty on May 26, 2005, and waited a full four months before filing his motion on September 26, 2005. That four-month period might be enough on its own to support the denial of Graham's motion because it is significantly longer than other delays that have been found to militate strongly against allowing a plea withdrawal. *See, e.g., United*

*States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004) ("unjustified 75-day delay, alone, supported the court's denial of a motion to withdraw"); *United States v. Durham*, 178 F.3d 796, 798-99 (6th Cir. 1999) (strongest factor supporting district court's denial of motion to withdraw was 77-day delay between plea and motion); *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (strongest factors supporting district court's denial of motion to withdraw were 67-day delay between plea and motion and failure to justify that delay); *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994) (delay of six weeks supported denial of motion); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) ("lengthy 55-day delay" supported district court's denial of motion to withdraw); *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (delay of five weeks supported denial of motion to withdraw). Graham argues that the delay should not work against him because he regretted his plea and asked his lawyer to withdraw it soon after it was entered. This argument, however, ignores the fact that it is generally the delay between the plea and the motion that this court considers, not the delay between the plea and the first feelings of regret. Moreover, similar arguments have been rejected by this court before. *See United States v. Spearman*, 39 F. App'x 63, 68-70 (6th Cir. 2002); *see also Bashara*, 27 F.3d at 1181 (defendant complained to probation officer eleven days after entering plea that he regretted doing so). Graham also argues that he should not be punished for the delay since it was primarily caused by his lawyer's attempts to dissuade him from trying to withdraw his plea. This court held in *Spearman*, however, that "[d]isagreement with one's attorney is not a valid reason for failing to move for withdrawal of a plea earlier in the proceedings." *Spearman*, 39 F. App'x at 70.

Also weighing against Graham is the fact that he has not consistently asserted or maintained his innocence. Graham claims that he should be allowed to withdraw his plea because he was "guilt-tripped" and pressured into it. This is hardly a resonating declaration of innocence. Graham did proclaim his innocence at his sentencing hearing, but that self-serving testimony should not overcome the fact that Graham pled guilty before the district court and, under oath, explained his role in the drug distribution and money-laundering conspiracy. This consideration should weigh against him in his attempt to withdraw his plea.

The circumstances surrounding Graham's guilty plea further indicate that he should not have been allowed to withdraw it. Graham's plea was nothing short of a knowing and willing admission of guilt. The district court went to great lengths to ensure that Graham was aware of the significance of a guilty plea as well as the rights that he was waiving. Graham did admit during his plea colloquy that he was taking medication for depression, but he also testified that taking the medicine did not interfere with his ability to understand what he was doing and that he completely understood everything that was going on. His previous experience with the criminal justice system — which included convictions for receiving stolen property, unauthorized use of a motor vehicle, and voluntary manslaughter — further suggests that he understood the significance of a guilty plea. Additionally, Graham's claim to have been unwillingly pressured into his guilty plea is belied by his statement to the district court that no one had threatened him or forced him to plead guilty. Together, these facts indicate that Graham's plea was not the kind that should be allowed to be withdrawn

since it was not the result of a hastily entered plea made with an unsure heart and a confused mind.

*See United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991).

III.

For the foregoing reasons, the judgments of the district court are AFFIRMED. Additionally, we grant Mr. Schad's request to withdraw as Riley Troy Graham's counsel, but we deny his motion to withdraw the brief filed on behalf of his client.