NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0441n.06

Case No. 20-5889

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Sep 23, 2021 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| RODNEY SCOTT PHELPS, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: SUTTON, Chief Judge; BATCHELDER and LARSEN, Circuit Judges.

SUTTON, Chief Judge. A jury convicted Rodney Scott Phelps of wire fraud and wire-fraud conspiracy after the government charged him with perpetrating a multi-million dollar, Ponzi-like scheme that had several victims. The district court sentenced him to 108 months in prison. We affirm his conviction and sentence.

I.

From 2012 to 2014, Phelps and Jason Castenir ran Maverick Asset Management, a private equity firm. According to the evidence submitted at trial, the duo induced victims to invest with Maverick by claiming that Phelps was an experienced investor, an heir to the Morton Salt family, and a trustee for the family's fortune through the "Phelps Family Trust." Each statement was untrue, as were many others.

The investment ideas took different forms. Oil concessions in Belize. Unsecured debt instruments called debenture offerings. A casino in Tunica, Mississippi. Each one had a common thread. Phelps and Castenir promised low-risk, high-return investments backed up by the resources of Phelps's vast trust. Several investors bought what they were selling. At times, the promised returns looked like real returns based on misleading documents and statements sent by the tandem to their investors. But the documents and statements were all invented. The alleged investments had one other thing in common: They did not pan out. Instead of investing the funds as promised, Phelps and Castenir moved the money around to backfill other investment accounts and expenses, all while enriching themselves.

The Ponzi-like scheme eventually unraveled. Investors lost money. Federal officials caught wind. Castenir pleaded guilty to counts of conspiracy to commit wire fraud, commodities fraud, and transactional money laundering, and he agreed to cooperate. A federal grand jury indicted Phelps on 12 wire fraud counts and one conspiracy to commit wire fraud count. 18 U.S.C. §§ 1343, 1349.

Phelps went to trial and testified on his own behalf. The jury convicted him on all counts. The district court sentenced Phelps to 108 months and required him to pay $2,437,875.30 in restitution.

II.

*Sufficiency of the evidence*. To convict someone of wire fraud, the government must establish that he willfully participated in a scheme with the intent to obtain money by false pretenses and used interstate wire communications to further it. 18 U.S.C. § 1343; *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014). To convict someone of conspiring to commit wire fraud, the government must establish a knowing agreement to further the fraud. 18 U.S.C. § 1349;

2

*Rogers*, 769 F.3d at 377. At this stage in the case, we ask only whether, after construing all evidence in favor of the jury verdict, "*any* rational trier of fact could have found the essential elements" of these crimes "beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Ample evidence supports the convictions. Multiple victims testified that Phelps lied to them about his wealth, his ties to the Morton Salt fortune, his investing experience, the ongoing success of the investments, and the backstop of the family trust for the investments. Castenir helped propagate those lies and added a few of his own. Those lies, in turn, encouraged the victims to trust Phelps's company with their money. Documentary evidence told the same story, including emails from Phelps and Castenir to investors; dishonest marketing materials on Maverick's website; and extensive bank records demonstrating that Phelps used most of the newly invested funds to pay earlier investors, to cover Maverick's operating expenses, and to line the co-conspirators' pockets. Evidence that Phelps covertly instructed Castenir to avoid detection iced the evidence in support of the convictions.

Phelps nonetheless insists that it was all Castenir's fault—that Castenir was the mastermind behind the scheme, that Phelps merely fell "asleep at the wheel," and that Phelps did not actively participate in the fraud. Appellant Br. at 38. But plenty of evidence implicates Phelps directly, including lies he, not just Castenir, told several investors. Plus, Castenir corroborated the victims' testimony and detailed Phelps's knowing involvement in the conspiracy.

Phelps resists the relevance of this last feature of the trial, arguing that Castenir's testimony lacked credibility. But when assessing a sufficiency claim, we do not evaluate witness credibility or "substitute our judgment for" the jury's. *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir.

3

1994). To the contrary, we construe the evidence in favor of the jury's verdict, not in favor of the defendant's view of what the jury should have done. *Jackson*, 443 U.S. at 319.

It makes no difference that Phelps intended, he says, to obtain real profits for his investors. For one, there was plenty of evidence that would have allowed the jury to discredit that theory. For another, even if the jury believed this testimony, the evidence still showed that he lied to individuals to garner additional investments, which suffices to support a wire-fraud conviction under § 1343. *See United States v. Daniel*, 329 F.3d 480, 488 (6th Cir. 2003).

*Motion for new trial*. After the trial ended, the government discovered that the FBI had been investigating Castenir for a securities-fraud conspiracy unrelated to this case. It promptly informed Phelps, who promptly sought a new trial based on this information. Fed. R. Crim. P. 33. The district court rejected the request. Only if the district court's decision amounted to an abuse of discretion will we require a new trial. *United States v. Kettles*, 970 F.3d 637, 649 (6th Cir. 2020).

No abuse of discretion occurred. As the district court observed, the additional impeachment evidence was largely "cumulative of evidence the jury already heard about Castenir during trial." R.196 at 5. Phelps's counsel cross-examined Castenir extensively about his propensity for fraudulent behavior: his involvement in making the fake website and his knowingly criminal decision to help "rob[] Peter to pay Paul" in this case. R.175 at 230–31. On top of that, the jury did not need to rely on Castenir's testimony alone to convict, as there was plenty of other evidence to support the convictions. *See United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982) (holding that new evidence must "likely produce an acquittal" to warrant a new trial). In fact, there was a witness for each act of wire fraud: Dion Garnett for the oil concessions, Rebecca Winemiller for the debenture program and casino.

*Prior acts evidence*.  Phelps adds that the district court wrongly permitted prior-acts evidence under Evidence Rule 404(b).  The rule prohibits admission of other bad acts when used to prove only that a person acted "in accordance with the character" demonstrated by the past acts.  Fed. R. Evid. 404(b)(1).  But the rule expressly permits other acts when used for "another purpose," such as "motive," "intent," or "identity."  *Id.* 404(b)(2).

The district court permissibly allowed this testimony.  Some of the evidence, for example, was directly relevant to the charged offense.  *Id.* 401, 402.  Start with the evidence that Phelps rented a home under Maverick's name and paid for it using a Maverick account.  It showed Phelps's ties to Maverick and that he comingled Maverick funds for his own purposes.  The same goes for evidence that Phelps presented a falsified Maverick account statement to his landlord to prove that Maverick could pay the rent.

The government used the other challenged testimony to show that Phelps used a signature false story to perpetrate the fraud—that he was a rich heir to the Morton Salt family and that the family trust would back up the investments.  The government may use such "distinctive" evidence to identify the defendant under Evidence Rule 404(b)(2).  *United States v. Ramer*, 883 F.3d 659, 670 (6th Cir. 2018) (quotation omitted).  It did not use this evidence to show criminal propensity; it used it to show his distinctive way of committing the fraud.  To make sure that was the case, the district court issued limiting instructions to prevent the jury from considering the evidence for impermissible purposes.

Phelps suggests that the evidence was unduly prejudicial and should have been discarded under Evidence Rule 403.  But the district court did not abuse its considerable discretion in making these rulings.  *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008).  Any error would be

harmless anyway given the extensive evidence that directly implicated Phelps. *See United States v. LaVictor*, 848 F.3d 428, 448 (6th Cir. 2017).

Phelps mentions other testimony—concerning his other business ventures, his treatment of business associates, his prior use of the relevant email account, his threats to Castenir as the scheme was unraveling—on this score. But he never objected to the admission of this other evidence at trial, meaning plain-error review applies. Fed. R. Crim. P. 52(b); *United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000). We look only for a "clear or obvious" error affecting the defendant's substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

No plain error occurred. In truth, Phelps's counsel elicited much of this testimony—regarding some of his other business ventures and his threats to Castenir—on cross-examination. And the rest of it was either relevant to this crime or fell within the safe harbor for evidence that shows a distinct manner of committing the crime.

*Writing testimony*. Phelps next argues that the district court erred by allowing nonexperts to connect Phelps to various documents based on his signature and writing style. Having failed to raise the argument at trial, Phelps must establish plain error on appeal. *Kelly*, 204 F.3d at 655.

Two Rules of Evidence set the framework. Rule 701 generally permits lay opinion testimony for nontechnical issues within the witness's perception. Fed. R. Evid. 701. Rule 901 generally permits lay witnesses to identify someone else's handwriting and other types of evidence. Fed. R. Evid. 901(b)(2). Taken together, the two Rules create considerable latitude when it comes to allowing nonexperts to testify about handwriting and the like. *See United States v. Harris*, 786 F.3d 443, 446–47 (6th Cir. 2015).

The relevant witnesses had ample knowledge to offer this testimony. They linked Phelps to various documents and emails based on their prior personal observations: McCracken, Holskey,

and Hubbuch based on their examination of other authenticated documents signed by Phelps; Hollis based on Phelps's unique email greetings to her; and Castenir based on his familiarity with Phelps's writing style and email address. None of the witnesses feigned expertise in writing identification. That suffices for plain error review. *Harris*, 786 F.3d at 446–47.

Phelps responds that two of the FBI agents—McCracken and Holskey—obtained background knowledge only by reviewing documents during the investigation for this case. Evidence Rule 901(b)(2), it is true, excludes lay handwriting testimony based on knowledge "acquired for the current litigation." Fed. R. Evid. 901(b)(2). But a preliminary *investigation* does not count as "for the current litigation." Familiarity gained by law enforcement officers during an investigation offers a permissible basis for identifying writing. *Harris*, 786 F.3d at 447–48; *United States v. Iriele*, 977 F.3d 1155, 1166 (11th Cir. 2020) (collecting cases). Phelps never argues that these agents gained familiarity only *after* the investigation ended. No error, let alone a plain error, occurred.

*Substitution of counsel*. Phelps protests that the district court did not permit him to substitute new attorneys five days before trial or on the last day of trial. In reviewing this discretion-filled decision, we look to the timeliness of the request, the court's diligence in handling the issue, the level of conflict between the attorney and client, and the public's interest in the efficient administration of justice. *United States v. Steele*, 919 F.3d 965, 973 (6th Cir. 2019).

The district court did not abuse its discretion in rejecting either request. As to the first request, it came late, just five days before the initial day of trial. And the court rejected it only after holding a 90-minute hearing on the issue. Addressing each of Phelps's arguments, the court determined that communications between Phelps and his attorney remained intact and that his able counsel would be more than adequately prepared for trial despite at least some communication

7

problems arising from Phelps's own conduct. After two and a half years of preparation and six continuances, the trial court could fairly conclude that the public administration of justice required the trial to move forward.

As to the second request, each of these points applies with even greater force. It would be extraordinary at many levels to change counsel on the last day of trial. The court did not abuse its discretion in either respect.

Phelps resists this conclusion mainly on the ground that his communications with counsel were worse than the court let on, noting several instances in which he and his attorney did not see eye to eye on preparation strategy and tactical decisions. But differences like these do not invariably create an irreconcilable conflict between attorney and client. In truth, they happen often. *United States v. Barrow*, 287 F.3d 733, 738 (8th Cir. 2002) (noting that justifiable dissatisfaction "does not include a defendant's frustration with counsel who does not share defendant's tactical opinions but continues to provide zealous representation"). None of this, moreover, precludes the defendant from bringing an ineffectiveness claim in a § 2255 motion.

*Competency to stand trial*. Phelps argues that the district court should have ordered a competency hearing due to his various physical ailments. A federal statute requires a district court to order one if reasonable cause suggests that a defendant lacks the competence to stand trial. 18 U.S.C. § 4241(a). Incompetence to be tried occurs when a criminal defendant lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or if he does not have "a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quotations omitted). That is not an everyday occurrence, as the "bar for incompetency is high." *United States v. Miller*, 531 F.3d 340, 350 (6th

8

Cir. 2008). And an abuse-of-discretion standard generally applies. *United States v. Dubrule*, 822 F.3d 866, 879 (6th Cir. 2016).

Phelps's circumstances do not clear this bar. No evidence shows that Phelps lacked a rational understanding of the proceedings, whether due to physical or mental conditions. The evidence in reality points the other way. When Phelps mentioned his medications before trial, the district court observed that he was "fully coherent" and "fully capable of participating in trial." R.253 at 51. That observation followed a lengthy discussion between the district court and Phelps, which followed a detailed letter from Phelps. The pattern persisted at trial. The court conducted a colloquy that ensured Phelps understood his rights before he testified. And during his testimony, he comprehensibly responded to questions. Phelps, to be sure, complained of physical pain and occasional forgetfulness. But that alone does not suffice. The statute refers to "mental incompetency," not physical incompetency and not occasional forgetfulness. The evidence simply does not show that he was incompetent to stand trial.

*Prosecutorial misconduct.* Phelps seeks a new trial on the ground that the prosecutors engaged in misconduct. To obtain relief, the prosecutors' misbehavior must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). No objection was made to the prosecutors' behavior during trial. That means plain-error review applies, requiring the conduct to be "exceptionally flagrant." *United States v. Bradley*, 917 F.3d 493, 506 (6th Cir. 2019) (quotation omitted).

No such conduct occurred. Take the prosecutor's statement in closing about "credible" witnesses testifying against Phelps. R.240 at 135. Prosecutors legitimately make statements like this all the time so long as they don't "manipulate or misstate the evidence" in the process, *Darden v. Wainwright*, 477 U.S. 168, 182 (1986), or "convey the impression that evidence not presented

to the jury, but known to the prosecutor," corroborated the witness's testimony, *United States v. Young*, 470 U.S. 1, 18 (1985). The prosecutor's statement steered clear from that impermissible line.

So too for other statements. The government stated in closing that it "probably" could have brought "a thousand counts." R.240 at 100–01. But this statement was merely explaining how each separate wiring qualifies under 18 U.S.C. § 1343 even though the government just charged Phelps for "a representative sample of the wirings." R.240 at 100. Phelps also highlights some snippy exchanges between him and the prosecutor. But these statements likewise did not infect the trial with pervasive unfairness, especially when viewed in the "context of the entire trial." *Young*, 470 U.S. at 11. No reversible error occurred.

*Jury charge*. Phelps challenges the district court's use of a "nonunanimity" instruction for the conspiracy charge. The district court's instruction, taken from Sixth Circuit Pattern Jury Instruction 8.03B, permitted the jurors to convict Phelps so long as they all felt that he agreed to commit a fraudulent scheme, even if they disagreed about which ones (oil concessions, debentures, or the casino) he agreed to commit. Abuse-of-discretion review applies. *United States v. Hendrickson*, 822 F.3d 812, 822 (6th Cir. 2016).

Recall that the statute he was charged with violating, 18 U.S.C. § 1349, just requires a knowing agreement between two (or more) people to commit wire fraud. *Rogers*, 769 F.3d at 377. We generally permit courts to give this nonunanimity instruction when, as here, "several possible sets of underlying brute facts make up a particular element." *Richardson v. United States*, 526 U.S. 813, 817 (1999). "The means used to carry out a fraudulent scheme are not separate elements requiring unanimity." *United States v. Boliaux*, 915 F.3d 493, 495 (7th Cir. 2019).

Phelps responds that sometimes a "specific unanimity" instruction—one that requires agreement on how the offense occurred—offers the better path. Cases that warrant such instructions generally involve situations where the evidence is exceptionally complex or the alternative means are only marginally related. *See Hendrickson*, 822 F.3d at 823. That was not true here, as the district court legitimately found. The different schemes all involved the same two people and the same fraudulent backstory. The district court acted within its discretion to instruct the jury the way it did.

*Ineffective assistance of counsel*. Phelps complains that his counsel's performance during trial was ineffective. But "we generally do not review such claims on direct appeal, preferring that the defendant raise such claims (if at all) in a § 2255 petition." *United States v. Quinlan*, 473 F.3d 273, 280 (6th Cir. 2007). We see no reason to make an exception here.

III.

Phelps challenges his sentence on several grounds. Each receives clear-error review, at least for the underlying factual findings. *United States v. Ward*, 506 F.3d 468, 474 (6th Cir. 2007).

*Obstruction-of-justice enhancement*. Phelps contests the district court's two-level sentence enhancement for willfully obstructing justice during his trial testimony. *See* U.S.S.G. § 3C1.1. A court may impose this enhancement if it identifies material, perjured testimony. *See United States v. Roberts*, 919 F.3d 980, 990–91 (6th Cir. 2019).

The court imposed the enhancement after finding that Phelps lied on the stand when, for example, he denied telling victims that he was the heir to the Morton Salt dynasty and that his family trust had hundreds of millions of dollars to back up their investments. Ample evidence showed that Phelps lied.

In a variation on his sufficiency-of-the-evidence arguments, Phelps insists that he testified truthfully. Castenir, as Phelps sees it, was the only liar. But many witnesses besides Castenir contradicted material parts of Phelps's story. And we see no fair-minded reason to diverge from the district court's and jury's legitimate rejection of Phelps's story.

Phelps also worries that applying this enhancement will chill future defendants' willingness to testify. But the same could be said of our prior cases applying the enhancement. *United States v. Castro*, 960 F.3d 857, 870–71 (6th Cir. 2020). Plus, the opposite rule—that the enhancement could never be used for criminal defendants who lie on the stand—has problems of its own. In the end, the district court showed that it appreciated both sides of the issue, acknowledged that it did not want "to chill a defendant's right to testify," R.256 at 16, and permissibly thought Phelps earned the enhancement anyway.

*Sophisticated-means enhancement*. The district court applied a two-level sophisticated-means enhancement because Phelps's scheme involved "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B); *see United States v. Igboba*, 964 F.3d 501, 511 (6th Cir. 2020).

We see no clear error. As the district court observed, Phelps was complicit in "various sophisticated means to attract investors, to lull them into thinking that their investments were making money" over the course of a few years. R.256 at 38. The means in this instance included multi-step falsehoods to investors, fraudulent bank documents, fictitious website information, funneled money between investors, and more. Other courts have upheld this enhancement for similar conduct in Ponzi-like schemes. *See, e.g.*, *United States v. Meadows*, 866 F.3d 913, 918 (8th Cir. 2017) (frequent lies to defrauded investors); *United States v. Regensberg*, 381 F. App'x 60, 62 (2d Cir. 2010) (fraudulent loan documents, fake earnings reports, lies to investors, and

altered account statements); *United States v. Segal*, 687 F. App'x 192, 195 (3d Cir. 2017) (falsified documents).  And our court has upheld this enhancement for less intricate fraud schemes involving, for example, false documents, *United States v. Masters*, 216 F. App'x 524, 526 (6th Cir. 2007), and funneled funds, *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017).  We reach the same conclusion here.

*Abuse-of-trust enhancement*.  The abuse-of-trust enhancement applies if a defendant "abused a position of public or private trust" to facilitate "the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  It covers circumstances in which a "defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not," and it includes a defendant who "perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker."  U.S.S.G. § 3B1.3 cmt. n.3.

The district court did not clearly err in finding that Phelps falsely elevated himself to a position of trust.  Consistent with the commentary, "[a]n investment manager normally occupies a position of trust."  *United States v. Dobish*, 102 F.3d 760, 762 (6th Cir. 1996) (per curiam).  Phelps not only "led these folks to believe he was a sophisticated investment advisor," as the district court permissibly found, R.256 at 44; but he also emphasized how the investors could trust him and how safe their money would be with him.  As the district court aptly put it, Phelps "created the facade of legitimacy, along with representations to these victims that, essentially, their money would not be at risk, or very little risk," all the while "lull[ing] these investors into investing with him, into making them believe that their investments were safe."  *Id.* at 43–44.

Phelps does not meaningfully contest these fact-findings or the commentary's application.  He instead pushes back with a policy argument, noting that, if the enhancement applies here, it

will apply to every fraud case. Not so. Not all fraudulent schemes include concerted efforts to bolster the fraudster's bona fides based on deceit or otherwise put the fraudster in a unique position of trust with the defrauded party. The district court permissibly applied the enhancement.

*Substantively unreasonable sentence*. Even in the absence of any procedural errors, Phelps claims that his sentence was too high. His guidelines range was 108 to 135 months, and the district court sentenced him at the bottom of the range: 108 months. This within-guidelines sentence receives a presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc). Phelps does not remotely overcome this presumption. The district court considered each of his key objections—his age, lack of criminal history, medical ailments, and other personal characteristics—and acted well within its discretion in deciding that they did not require a below-guidelines sentence.

We affirm.