NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0064n.06
Filed: January 29, 2009

No. 06-3327

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| LAWRENCE JEFFREY HARRIS, | ) | |
| | ) | O P I N I O N |
| Defendant-Appellant. | ) | |

BEFORE:    MARTIN and McKEAGUE, Circuit Judges, and COLLIER, Chief District Judge.[*]

**McKEAGUE, Circuit Judge**.  This case involves an interesting tale of fraud and deception by a doctor attempting to avoid repaying his student loans to the government.  As a medical student, Lawrence Harris took out Health Education and Assistance Loans ("HEAL loans") in order to complete his education.  HEAL loans are private loans backed by the government.  After graduating, Harris did not make regular payments on his loans, and his private lender filed a claim for his loans with the Department of Health and Human Services ("HHS").  HHS paid the private lender, and then the government obtained a civil judgment against Harris.  Harris entered a repayment agreement after that judgment, but again failed to make consistent payments.  The government suspended Harris's

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

access to Medicare and Medicaid payments in November 2000, and, in 2002, Harris convinced the government that he was permanently unable to pay off his loans. The government forgave the loans and readmitted Harris to Medicare and Medicaid practice. Suspicious charges involving Harris led to an investigation. That investigation resulted in an indictment against Harris, charging him with ten counts of health care fraud, one conspiracy count, and one count of making a false statement.

A jury convicted Harris on all twelve counts, and the district court sentenced him to seventy-eight months in prison and $528,074 in restitution. Harris now appeals, challenging the denial of a motion to compel effective assistance of counsel that he filed just before trial began, the use of judicial fact-finding in his sentencing, and the obstruction of justice enhancement he received during sentencing. For the reasons set forth below, we affirm the district court's judgment.

## I. BACKGROUND

### A. History of Harris's Loans

Beginning in 1983, Harris attended the Ohio College of Podiatry Medicine. In order to attend Ohio College, Harris took out HEAL loans. HEAL loans are private loans backed by the government. Harris accrued $66,100 in loans during his time in school.

It is unclear if Harris ever took a deferment on his loans. It is clear, however, that Harris did not make at least six loan payments. Sallie Mae, the private lender responsible for the loans, filed an insurance claim with HHS. HHS repaid Sallie Mae for Harris's loans and Sallie Mae assigned the loans to HHS. HHS then referred the loans to the U.S. Attorney's Office in Cleveland, Ohio for collection.

**B.  The First Judgment against Harris and the Loan Repayment Plan**

In 1989, the government initiated a civil action against Harris to collect on the HEAL loans. It obtained a judgment against Harris in the amount of $127,520.18.  Based on that judgment, Harris and the government entered into a repayment agreement in 1991.  The plan required regular repayment be made from the reimbursements Harris received from Medicare for services rendered.[1] The government would receive the first $1,500 of the Medicare payments Harris received each month.  The next $10,000 each month would be Harris's, while anything over $11,500 in a month would be split equally between Harris and the government.

**C.  Harris's Attempts to Limit his Payments**

During the same period, Harris began attending an "asset protection class" offered by Jay Mitton.  He attended this class yearly, often with other doctors he knew.  One of the seminar books indicated that forming a corporation and working as the corporation's employee would allow an individual with heavy loan payments to have better control of his finances.  Harris received similar advice from his accountant, Kenneth Embry.  Embry indicated that, if Harris formed a corporation and listed himself as its employee, "Medicare would discontinue intercepting his funds." Repayment of Harris's loans was initially made from Medicare reimbursements which he obtained using his Medicare PIN number.  Creating a corporation would create a new PIN number for the corporation under which Harris could bill Medicare for reimbursements.  Embry indicated that Medicare would not deduct payments for Harris's repayment plan from Medicare reimbursements obtained using the

---

[1]Nationwide Insurance oversaw the Medicare trust fund.  Advance Med now serves that function.  For ease of reference, both entities are referred to as Medicare.

corporation's PIN number if Harris was listed as an employee of the corporation. Based on this advice, Harris formed Metropolitan Foot and Ankle ("Metropolitan") in 1993.

To incorporate under Ohio state law, Harris believed he needed to have other doctors as shareholders. He listed several other doctors as shareholders, doctors that he knew from school and who had also attended the Mitton seminars. One of these doctors was Dr. Taj Malik. Dr. Malik later testified he had never been involved with Metropolitan.[2] Dr. George Ilodi was also listed as a shareholder. Dr. Ilodi later testified that he had never been involved with or had any knowledge of Metropolitan.[3] After being contacted by FBI agents investigating Harris, Dr. Ilodi sent a letter to Harris inquiring why Harris had used Dr. Ilodi's name in connection with Metropolitan. Harris sent a response, but the response was addressed to Dr. Malik rather than Dr. Ilodi: in it, Harris apologized to Dr. Malik for using Dr. Malik's address in relation to Metropolitan and explained it away as an accident. Needless to say, the letter did nothing to assuage Dr. Ilodi's concerns about the use of his own name. Dr. Kenneth Walker was also listed as a shareholder.[4] Dr. Walker's wife testified that Dr. Walker was not involved in any way with Metropolitan. Dr. Damon Litsey and Dr. Brenda

---

[2]Dr. Malik had been charged with taking a kickback previously. He was found not guilty.

[3]Dr. Ilodi was convicted of receiving a kickback in an unrelated case. He was found guilty, and his license to practice medicine was revoked in 2002.

[4]Dr. Walker was diagnosed with sarcoidosis in 1992. He stopped practicing in 2000, and he died in 2002.

Casselberry also testified that, though listed as shareholders in Metropolitan, neither had any involvement with Metropolitan.[5]

When Metropolitan first incorporated, Medicare began deducting Harris's payments from reimbursements to Metropolitan. In response, Harris informed Medicare he was simply a Metropolitan employee. He submitted a handwritten chart showing other doctors' roles at Metropolitan. It listed Dr. Walker as president of Metropolitan and Dr. Casselberry as president of Metropolitan's Podopediatrics Department, though neither doctor had any involvement with the corporation. Harris also wrote letters to Medicare–using other doctors' names–that indicated Harris had no financial interest in Metropolitan and that Harris would be fired if Medicare continued deducting amounts Harris owed under the repayment plan from Metropolitan's Medicare payments. Harris did not receive permission from these other doctors to use their names, but his efforts were successful: Medicare stopped deducting amounts Harris owed from reimbursements made to Metropolitan. He wrote the first of these letters in 1993, and Medicare stopped deducting amounts Harris owed from reimbursements made to Metropolitan's Medicare reimbursements soon after.

Emboldened by the success of this ruse, Harris formed another corporation, Achilles Foot and Ankle ("Achilles"), in 1994. He did not actively use the Achilles corporation until the fall of 2000, shortly after he learned that the government was going to exclude him from Medicare. He submitted requests for PIN numbers under Achilles for both himself and Dr. Walker. He admitted signing for both himself and Dr. Walker. Harris included with the application an employment

---

[5]Many of these doctors were also falsely listed as practicing at Metropolitan in an organizational chart Harris submitted to the government at the time.

agreement and withholding form signed by Dr. Walker. As with Metropolitan, Dr. Walker's wife denied that Dr. Walker had any involvement in Achilles. She also testified that the signatures on the forms were not from Dr. Walker. She further testified that, at the time the forms were signed, Dr. Walker could no longer hold a pen.

Through his use of these corporations, Harris was able to limit the amount the government received under his repayment plan. Payments were made using his Medicare reimbursements from 1991 through 1993. In 1993, the government stopped deducting payments from Metropolitan's Medicare reimbursements based on the letters received from Harris. In 1994, Harris made two direct payments to the government. In 1995, Harris made no payments until May. He then made regular payments for the rest of the year. Harris made no meaningful payments on his debt in 1996 or 1997.[3] He made occasional, small direct payments in 1998 and 1999. For example, he made a payment of $39.45 in June of 1999. In 1999, the government resumed taking payments from Metropolitan's Medicare reimbursements. There were no further payments after May 1, 2000.[4]

## D. Exclusion from Medicare and Harris's Loan Forgiveness

In June 2000, the government issued a letter to Harris informing him that he had to make payments or he would be barred from Medicare and Medicaid. Harris made no further payments. He was then excluded from Medicare and Medicaid on November, 20, 2000. He continued to

---

[3]Though the exhibits are not in the record, it appears from the phrasing of questions at trial that Harris did make payments in 1996 and 1997, but that they were so small as to have no impact on the principal of the loan.

[4]On May 1, 2000, Harris made a loan payment of $20.65.

practice, though he later testified that he did not bill Medicare for any services rendered during his exclusion.

In 2001, Harris applied for loan forgiveness. Harris had his accountant, Ken Embry, fill out the financial statement provided by the government.[5] The financial statement form clearly stated that all statements must be true under penalty of perjury. The form listed Metropolitan as Harris's employer. It did not list Achilles.

Based on the financial statement, the government found Harris could not repay the loan. The principal and interest at the time totaled $216,492.98. The government forgave the entire loan. After the government forgave his loan, Harris applied to be readmitted to Medicare. He was readmitted to Medicare in 2002.

**E. Investigation into Suspicious Billing Activity**

During his exclusion from Medicare, multiple suspicious requests for reimbursement were made for services charged using Dr. Walker's Achilles PIN number. Medicare referred the requests to the Office of Investigations in HHS. Special Agent Catherine Hanselman led the investigation. Hanselman contacted Medicare beneficiaries associated with the charges for services. All of the beneficiaries identified Harris as the doctor that provided the services for which payment was sought from Medicare using Dr. Walker's PIN.

Based on this information, Hanselman obtained a search warrant for Harris's offices. After executing the warrant, Hanselman obtained a second search warrant in order to obtain further patient

---

[5]Embry had previously been convicted twice of tax fraud. Harris testified that he did not know of those convictions.

files. An analysis of the patient files revealed that, in the records analyzed, almost all of the patients for which reimbursement was sought using the Achilles PIN numbers matched entries in Harris's records.

The investigation also implicated Barbara Kelley. Embry testified that Kelley had worked for Harris for years. When investigators first searched Harris's office, Kelley identified herself as the office manager. Hanselman obtained a subpoena for Kelley's employment records. Harris responded to the subpoena with a letter stating that, speaking "as the custodian of records" for both corporations, Barbara Kelley had never been an employee of either corporation. Multiple documents contradicted this letter, including an application for health coverage at Metropolitan that listed Kelley as an employee.

**F. Procedural Background**

The investigation ultimately led to an indictment charging Harris with ten counts of health care fraud, one count of making a false statement and one count of conspiracy. The district court appointed counsel for Harris and scheduled the original trial date for June 13, 2005. Harris's attorney sought a continuance because it was "a complex case" and he needed "more time to thoroughly review all of the discovery." The court granted a continuance until October 3, 2005. Trial was later reset for October 11, 2005.

On October 7, 2005, Harris filed a pro se motion in paper form without his attorney's knowledge. The motion was captioned a "Motion to Compel Effective Assistance of Counsel." It sought a continuance because Harris felt unprepared for trial. Specifically, he claimed that his attorney's failure to share discovery materials with him prevented him from lending his expertise to

the case. The motion noted that the "defendant is emphatically stating that he is not at odds with Court Appointed Counsel's defense strategy." October 7 was the Friday before Columbus Day, a federal holiday on which the federal courts were closed. Harris did not send a copy of the motion to the trial judge or to opposing counsel.

On October 10, Columbus Day, Harris met with his counsel to discuss the upcoming trial. At the end of that meeting, Harris informed his counsel that he had sought a continuance. Early the next morning, Harris's counsel called the court and informed the judge about the motion. The trial judge then met briefly with both counsel in chambers.

The court addressed the motion on the record at the start of trial. The court denied the motion because defense counsel had a "stellar reputation," defense counsel stated he had been preparing for trial for a significant amount of time, and Harris himself had missed many meetings with his counsel before trial. Finding no prejudice to Harris in denying the motion, the court also noted the prejudice to the government that a continuance would cause. The government had prepared for trial on that date, rearranged several schedules, and procured witnesses for trial.

The jury trial commenced, and, after a four-day trial, the jury–not surprisingly–convicted Harris on all counts. At sentencing, the trial judge applied a number of sentencing enhancements, including enhancements for the amount of the loss, use of sophisticated means, Harris's position of trust as a doctor in the Medicare system, his role as a leader in the offense, and obstruction of justice. Adding these enhancements to his base offense level produced an advisory Sentencing Guidelines range of seventy-eight to ninety-seven months. The court sentenced Harris to a prison term of seventy-eight months, three years of supervised release, and required restitution in the amount of

$528,074. The statutory maximum for counts 1, 11, and 12 was five years in prison; the statutory maximum for counts 2-10 was ten years imprisonment. The court made clear that Harris was sentenced to sixty months each for counts 1, 11, and 12, and seventy-eight months for each of the remaining counts. The sentences were to be served concurrently.

## II.  ANALYSIS

### A.  Motion to Compel Effective Assistance of Counsel

Harris first argues that the district court erred in denying his motion to compel effective assistance of counsel. In practical effect, this was a motion for a continuance, as it sought time in which Harris could review discovery materials. "[B]road discretion must be granted trial courts on matters of continuances." *Morris v. Slappy*, 463 U.S. 1, 11 (1983). A denial of a motion to continue is reviewed only for abuse of discretion. *United States v. Garner*, 507 F.3d 399, 408 (6th Cir. 2007). A denial of a continuance amounts to a constitutional violation "only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris*, 463 U.S. at 11-12. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1969). To succeed on appeal, the movant must show that the denial resulted in actual prejudice. *United States v. Crossley*, 224 F.3d 847, 854 (6th Cir. 2000). Prejudice requires showing the "continuance would have made relevant witnesses available or added something to the defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997) (*quoted in Crossley*, 224 F.3d at 855). A showing of prejudice based on new evidence or new witnesses that

the defendant would have produced if the motion had been granted must be made with specificity. *United States v. Graham*, 278 F. App'x 538, 546 (6th Cir. 2008); *see also King*, 127 F.3d at 487.

The district court did not abuse its discretion in denying the motion. District courts must "assembl[e] the witnesses, lawyers and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Morris*, 461 U.S. at 11. Harris filed his motion late on a Friday afternoon in paper form and did not provide a copy to his attorney or serve the attorney for the government.[6] He did not inform his own attorney about the motion until Monday, and the judge did not receive the motion until just before the start of trial on Tuesday morning. The lawyers and jurors were already present by the time the court could address the motion. In deciding to deny Harris's motion, the court noted that "the government has a substantial number of lay witnesses who have been put on notice of their obligation to appear for trial" and that the government's case agent had also undergone "substantial inconvenience" to meet the schedule for trial. The court also observed that Harris's attorney had spent a substantial amount of time preparing for Harris's trial, and the court noted that Harris's attorney continued preparing for trial after he learned of Harris's motion. These factors cut strongly in favor of upholding the district court's exercise of its discretion.

Nor can Harris identify any prejudice in the denial. Harris's motion indicated he felt his counsel was inadequately prepared–particularly because his counsel had failed to give Harris all the discovery materials to review. Yet he does not identify with any specificity what the continuance

---

[6]Presumably, the paper motion was not docketed by the clerk's office until later on Tuesday.

would have added to his defense. He emphasizes his counsel's failure to consult him on the discovery material; however, his counsel examined Harris on the stand regarding a wide array of discovery materials. During his testimony, Harris discussed roughly twenty-five different exhibits. On appeal, Harris identifies no further piece of discovery that his counsel failed to address.

Harris also contends on appeal that the denial of the continuance prevented him from "provid[ing] the names and addresses of witnesses that would have assisted in his defense." Harris has not identified any specific witnesses he would have called. Over the course of the trial, at least twenty-two witnesses were called–including all of the doctors Harris contends were involved in either Metropolitan or Achilles, as well as Harris's accountant.

By failing to identify any specific negative effect resulting from the denial of the motion for continuance, Harris has failed to make the requisite showing of actual prejudice. Accordingly, the district court did not abuse its discretion in denying the motion.

Harris also contends the denial of the motion violated his right to counsel. In Harris's motion to compel effective assistance of counsel, Harris argued that if the court denied his motion, the denial would prevent him from receiving effective assistance of counsel. The motion also stated that "if by some strange rule of law, the Defendant is precluded from receiving the requested materials of any type until the 11th hour because the Defendant is 'Represented by Counsel' Then [sic], please consider this a motion to appoint Defendant as Co-Counsel." Harris's brief on appeal recites the applicable standard for reviewing a motion to substitute counsel and then contends that the denial of the continuance "rose to the level of a violation of his fundamental right to due process because he was effectively denied the assistance of counsel."

Neither of these Sixth Amendment arguments alters our finding that the district court did not abuse its discretion in denying the motion. Assuming Harris's motion did constitute a motion to be allowed to represent himself as co-counsel,[7] the district court did not abuse its discretion in denying the motion. In assessing a motion to substitute counsel, a court must consider

> the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense . . . Further, [c]onsideration of such motions requires a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*United States v. Saldivar-Trujillo*, 380 F.3d 274, 277 (6th Cir. 2004) (quoting *United States v. Iles*, 906 F.2d 1122, 1130 n.8 (6th Cir.1990)).

Harris's motion did not satisfy any of these elements necessary to substitute counsel. Harris's motion was not timely. He filed it late on the Friday before trial would begin and did not notify the court, opposing counsel, or his own attorney of the motion. *Compare United States v. Trujillo*, 376 F.3d 593, 606-07 (6th Cir. 2004) (finding a motion to substitute counsel filed three days before trial was untimely); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (finding a motion to substitute two weeks before trial was untimely). The district court also addressed the adequacy of Harris's representation. The court found that Harris had met multiple times with his counsel, that

---

[7]We note that the motion itself was not an unqualified motion to substitute counsel. In fact, Harris sought to represent himself only if there was a rule barring him from seeing discovery materials while represented by counsel. There is, of course, no such rule. The district court may reasonably have taken Harris at his word that he did not want to represent himself if there were no such rule. Furthermore, Harris could either be represented by counsel or he can represent himself (with or without standby counsel). There is no right to be "co-counsel" in representing yourself.

his counsel had worked hard in preparation for trial, and that his counsel had a stellar reputation in the community. Further, Harris himself asserted that there was not a total lack of communication: not only had he met multiple times with his counsel, but his motion stated that he agreed with his counsel's strategy. Finally, the public interest in the prompt and efficient administration of justice outweighed Harris's right to substitute counsel at the last minute in this case. Harris expressed, at most, a limited interest in representing himself. Trial, meanwhile, was imminent. The government and the court had invested significant resources in preparing for trial on that day, while Harris had not demonstrated any prejudice that would flow from continuing with his current counsel. Thus, the district court did not abuse its discretion in denying the motion.

Additionally, the denial of the motion did not deny Harris effective assistance of counsel. The Sixth Amendment does not require that the accused have a "meaningful attorney-client relationship." *Wilson v. Mintzes*, 761 F.2d 279 n.3 (6th Cir. 1985). Harris's motion did not allege acts that rose to the level of ineffective assistance of counsel, and Harris made clear that he approved of his counsel's trial strategy. As such, it is impossible to say that the district court abused its discretion in finding Harris's counsel was providing adequate representation.

**B. Judicial Fact-Finding**

Harris did not challenge the fact-finding below, and he acknowledges that plain error review applies to this argument on appeal. Nevertheless, Harris argues the district court committed plain error by engaging in judicial fact-finding en route to determining the Guidelines range for his sentence. Harris acknowledges that Sixth Circuit precedent stands in opposition to his argument. The en banc Sixth Circuit recently upheld the use of judicial fact-finding in calculating the

Guidelines range so long as the district court treats the Guidelines as advisory. *United States v. Vonner*, 516 F.3d 382, 384-85 (6th Cir. 2008) (en banc); *see also United States v. Osborne*, 545 F.3d 440, 445 (6th Cir. 2008); *United States v. Phillips*, 516 F.3d 479, 485-86 (6th Cir. 2008). The district court in this case made factual findings to determine the Guidelines range and treated the Guidelines range as advisory. In the absence of an intervening en banc or Supreme Court decision, we are bound by these opinions. *See United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000).

Harris relies heavily on *Cunningham v. California*, 549 U.S. 270 (2007), alleging that *Cunningham* stands for the proposition that judicial fact-finding that increases the Guidelines range is impermissible. The Sixth Circuit has previously held that *Cunningham* does not affect judicial fact-finding inside the statutory range when the district court treated the Sentencing Guidelines as advisory. *See United States v. Conatser*, 514 F.3d 508, 527-28 (6th Cir. 2008)*; United States v. Mayberry*, 540 F.3d 506, 517 (6th Cir. 2008). Accordingly, we find the district court did not err in finding facts at sentencing en route to a sentence within the statutory range.

## C. Obstruction of Justice

Harris also challenges the obstruction of justice sentencing enhancement. He argues that (1) the enhancement is unconstitutional as a violation of due process; (2) the enhancement is unconstitutional as an infringement of his right to testify; (3) the enhancement is unconstitutional because it deprives him of the right to trial by jury; (4) the application of the enhancement was erroneous because it ignored the equally plausible inference that the other witnesses were lying; and (5) the application of the enhancement was erroneous because the sentencing judge relied on postverdict comments the jury made. All five claims lack merit.

Both parties agree that the Supreme Court squarely addressed the due process involved in the obstruction of justice enhancement in *United States v. Dunnigan*, 507 U.S. 87, 95 (1993), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997).[8] *See also United States v. Williamson*, 154 F.3d 504, 505 (3d Cir. 1998) ("In *United States v. Dunnigan* . . . the Supreme Court held that a defendant's due process rights are not violated when a district court enhances a defendant's sentence under U.S.S.G. § 3C1.1 based on a finding that the defendant committed perjury."). More recent decisions also uphold the obstruction of justice enhancement against constitutional attack. *United States v. Williams*, No. 07-3096, 2008 WL 2952788, at *2 (6th Cir. July 30, 2008); *United States v. Negrete*, 537 F.3d 918, 923 (8th Cir. 2008) (addressing *Booker* and the preponderance of the evidence standard); *United States v. Addison*, 253 F. App'x 849, 851 (11th Cir. 2007) (addressing due process argument that enhancement lacked protection of indictment and trial). Harris "objects" to *Dunnigan*'s holding. He identifies no later Supreme Court decision challenging that holding, however, and this court is bound by decisions of the Supreme Court.

Harris also challenges the use of the enhancement because it provides a punishment for perjury without providing a jury trial. This argument largely repeats Harris's challenge to judicial fact-finding. To the extent that it does, the argument must fail for the reasons given above. Harris also believes that a jury trial is needed because the enhancement is essentially a criminal charge masquerading as a sentencing enhancement. *Dunnigan* rejected a similar argument, noting that "the

---

[8]*Dunnigan* requires the district court to state which part of defendant's testimony the judge finds to be perjury and to make specific findings as to each element of perjury. *United States v. Chance*, 306 F.3d 356, 390 (6th Cir. 2002). The district court fulfilled both requirements.

enhancement is more than a mere surrogate for a perjury prosecution. It furthers legitimate sentencing goals relating to the principal crime, including the goals of retribution and incapacitation." *Dunnigan*, 507 U.S. at 97; *see also Williams*, 2008 WL 2952788, at *2. As such, the enhancement is an appropriate part of sentencing and does not violate Harris's right to a jury trial.

Harris's argument regarding the right to testify fares no better. *Dunnigan* squarely addressed it as well:

> Respondent cannot contend that increasing her sentence because of her perjury interferes with her right to testify, for we have held on a number of occasions that a defendant's right to testify does not include a right to commit perjury. Nor can respondent contend § 3C1.1 is unconstitutional on the simple basis that it distorts her decision whether to testify or remain silent. Our authorities do not impose a categorical ban on every governmental action affecting the strategic decisions of an accused, including decisions whether or not to exercise constitutional rights.

*Dunnigan*, 507 U.S. at 96 (citations omitted); *see also Williams*, 2008 WL 2952788, at *2; *Addison*, 253 F. App'x at 851. Therefore, the obstruction of justice enhancement does not violate the Sixth Amendment. Accordingly, there is no error–much less plain error–in the district court's use of the obstruction of justice enhancement.

Harris also challenges the sufficiency of the evidence supporting the enhancement. Specifically, he argues that the district court finding "fail[ed] to take into account the reasonable inference that the other doctors who testified" perjured themselves to protect their medical licenses. A district court's factual findings underlying the enhancement are reviewed for clear error. *United States v. Davist*, 481 F.3d 425, 427 (6th Cir. 2007). The district court's assessment of witness credibility as it affects a sentencing enhancement is "basically unassailable." *United States v.*

*Maliszewski*, 161 F.3d 992, 1020 (6th Cir. 1998). As the record is replete with evidence supporting

the district court's finding, Harris's sufficiency-of-the-evidence argument must fail.

Finally, Harris notes in a footnote that it "is problematic" that the district court considered

post-deliberation jury statements. This court does not consider an issue raised so casually. *United*

*States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). Even if we did, the statement Harris objects

to did not indicate reliance on the jury; it was simply an observation that the jury and the judge both

found Harris incredible.

## IV. CONCLUSION

We **AFFIRM** the sentence imposed on Harris and the denial of the motion to compel

effective assistance of counsel.