NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0328n.06

Case No. 22-6046

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td></td><td></td><td></td></tr>
<tr><td>UNITED STATES OF AMERICA,</td><td>)<br>)</td><td rowspan="2">FILED<br>Jul 18, 2023<br>DEBORAH S. HUNT, Clerk</td></tr>
<tr><td>    Plaintiff-Appellee,</td><td>)<br>)</td></tr>
<tr><td>v.</td><td>)<br>)<br>)</td><td>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF</td></tr>
<tr><td>TYRECUS J. CROWE,</td><td>)<br>)</td><td>KENTUCKY</td></tr>
<tr><td>    Defendant-Appellant.</td><td>)<br>)</td><td>OPINION</td></tr>
</table>

Before: McKEAGUE, GRIFFIN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. After pleading guilty to a drug conspiracy, Tyrecus Crowe had second thoughts and asked to withdraw his plea. The district court denied his request. It then increased his offense level because it found that he had sought to distribute about 77 pounds of methamphetamine and had led the conspiracy. But the court ultimately chose a sentence—250 months' imprisonment—well below Crowe's resulting guidelines range. Crowe now challenges the court's refusal to allow him to withdraw his plea. He challenges its decision to hold him responsible for the large quantity of drugs and for his leadership role. And he challenges the reasonableness of his below-guidelines sentence. These arguments all lack merit, so we affirm.

I

The government charged Crowe and seven others with conspiring to distribute at least 500 grams of methamphetamine in and around Bowling Green, Kentucky, between October 2019 and

August 2020. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846; Indictment, R.80, PageID 202–03. After Crowe's codefendants all chose to plead guilty, he followed suit. Plea Agreement, R.214, PageID 716–24.

In his plea agreement, Crowe admitted to the bare minimum facts of his offense: that he had conspired with several codefendants to distribute the charged amount of methamphetamine. *Id.*, PageID 717. In exchange, the government agreed to recommend a sentence at the low end of Crowe's guidelines range. *Id.*, PageID 720. But the parties did not calculate this range themselves. *Id.*, PageID 721. They instead recognized that the district court would "independently" determine the range and that Crowe could not withdraw his plea if the court rejected the government's recommendation. *Id.*, PageID 721, 723. Crowe also conceded that no "threats" had "been made in connection with" his plea agreement. *Id.*, PageID 724.

On February 23, 2022, the district court held Crowe's plea hearing. The court confirmed that Crowe understood the rights that he was giving up by pleading guilty. Plea Tr., R.297, PageID 1289–90. It confirmed that he understood the nature of his offense and possible punishments. *Id.*, PageID 1291–94, 1297–98. It confirmed that he could not withdraw his plea even if it chose a sentence different from his attorney's estimate or the government's recommendation. *Id.*, PageID 1293, 1298–99. And it confirmed that nobody had threatened him to induce his plea. *Id.*, PageID 1298. Ultimately, Crowe pleaded guilty by again confessing to the conspiracy's basic facts. *Id.*, PageID 1300. The court found his plea knowing and voluntary. *Id.*, PageID 1300–01.

Some six months later, Crowe moved to withdraw his plea. Mot., R.290, PageID 1265. He claimed not to have understood that the government would oppose his request for a downward variance below his guidelines range. *Id.*, PageID 1266. He alleged that his relationship with his prior counsel had "soured," that his new counsel had given him a better view of the government's

2

proof, and that he was innocent. *Id.*, PageID 1267. He lastly suggested that the government had threatened to prosecute his mother or other family members if he did not plead guilty. *Id.*

The district court denied his motion to withdraw. Op., R.308, PageID 1351. The court found that Crowe had waited too long to file the motion. *Id.*, PageID 1344–45. It also rejected Crowe's claim that he misunderstood the government's sentencing recommendation. This claim conflicted with Crowe's plea agreement (which noted that the government would recommend a sentence at the low end of the guidelines range) and with Crowe's sworn statements at the plea hearing (which confirmed this recommendation). *Id.*, PageID 1345–46. The court likewise held that Crowe's claims of innocence and of government threats conflicted with his plea-hearing statements. *Id.*, PageID 1347–49. It added that Crowe's extensive record undermined any claim that he misunderstood his plea. *Id.*, PageID 1349–50. The court lastly found that the withdrawal would prejudice the government, which had ceased all trial preparation. *Id.*, PageID 1350.

Meanwhile, a probation officer prepared Crowe's presentence report. The report revealed many details about Crowe's drug conspiracy beyond the conclusory facts that he admitted when pleading guilty. The report indicated that Crowe had led a large drug operation that transported "bulk" quantities of methamphetamine from California to Kentucky. PSR, R.313, PageID 1367.

Two specific episodes matter on appeal. In July 2020, Texas police stopped a speeding rental car driven by Brandon Slagle. *Id.*, PageID 1363. The police discovered 40 pounds of methamphetamine in the car. *Id.* The rental agreement showed that Crowe had rented this car for Slagle. *Id.* The police also later learned that Crowe had given Slagle $105,000 in cash to deliver to his California supplier, George Sanchez. *Id.*, PageID 1364. Sanchez had provided Slagle with the drugs, and Slagle was on his return trip to Kentucky when the police stopped him. *Id.*

About a month later, the police tracked Sanchez's phone to Arkansas and determined that it had been communicating with Crowe's phone. *Id.*, PageID 1365. Believing that Sanchez was in the midst of a cross-country trip to transport drugs, the police matched his phone to the location of two cars driving in tandem. *Id.* The police suspected that one of these cars, a Ford Mustang, had been acting as a "blocker" to distract them from the other one, a Toyota Corolla. *Id.* After stopping both cars, the police discovered 37 pounds of methamphetamine in the Corolla. *Id.*, PageID 1366. Raymond Derouse had been driving this car. *Id.*, PageID 1365. A few days before this stop, Crowe had met Derouse. *Id.*, PageID 1366. Crowe gave Derouse the money to pay Sanchez for the trip, and Derouse had been on his way back to deliver the drugs to Crowe. *Id.*

Aside from this direct evidence of drug distribution, the investigation revealed that Crowe lived well beyond his means. *Id.*, PageID 1363. His tax returns identified no legitimate sources of income. *Id.* But he could afford a $425,000 home using $130,000 in money orders as a down payment. *Id.* His bank account had over $196,000 "credited" to it during a nine-month period in 2020. *Id.* And he funded many businesses—from a barber shop to a landscape company—with unknown sources. *Id.* Crowe also placed thousands of jail phone calls after his arrest, often using the lines of other inmates to conceal his conversations. *Id.*, PageID 1367. Crowe boasted about his wealth in many of these calls. He claimed that he had spent $1 million on a Las Vegas trip and that he had enough hidden money "to last for 24 years[.]" *Id.*; Sent. Tr., R.327, PageID 1450.

Based on the drugs found during the stops of Slagle and Derouse, the presentence report held Crowe responsible for 77 pounds (or 34 kilograms) of pure methamphetamine. PSR, R.313, PageID 1367. This large quantity generated a large base offense level: 38. *Id.*, PageID 1368. The report next imposed a four-level enhancement for Crowe's leadership role in the conspiracy. *Id.*,

PageID 1369. When combined with a criminal history category of V, his total offense level of 42 resulted in a guidelines range of 360 months to life imprisonment. *Id.*, PageID 1391.

At sentencing, Crowe objected to the report's recommendation to hold him responsible for the drugs found in the two vehicles and to treat him as a leader of the conspiracy. Sent. Tr., R.327, PageID 1432. The district court overruled his objections. As for the drug quantity, it found the report's calculations "amply supported" by the vehicle stops. *Id.*, PageID 1453. As for the leadership role, the court relied on Crowe's unexplained wealth and his coconspirators' statements to find that he was the "kingpin" of the scheme. *Id.* Nevertheless, the court varied substantially downward from Crowe's guidelines range. It imposed a 250-month sentence. *Id.*, PageID 1478.

II

Crowe appeals both his guilty plea and his sentence.

A. Guilty Plea

He first argues that the district court should have allowed him to withdraw his guilty plea. Yet the entry of a guilty plea is a "grave and solemn act[.]" *Brady v. United States*, 397 U.S. 742, 748 (1970). Because guilty pleas waive many constitutional guarantees, the Constitution allows defendants to plead guilty only if they know of the surrendered rights. *See United States v. Rupp*, 2023 WL 370908, at *3 (6th Cir. Jan. 24, 2023). And Federal Rule of Criminal Procedure 11 implements this constitutional command by requiring district courts to confirm that the defendants understand many things. *See id.*; Fed. R. Crim. P. 11(b)(1). But once the court has ensured in a transcribed colloquy that a defendant has knowingly pleaded guilty, the defendant faces a "formidable barrier" to overturn the plea. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Even before a final judgment, defendants lack an "absolute right" to withdraw a guilty plea. *United States v. Ellis*, 470 F.3d 275, 280 (6th Cir. 2006). Under Rule 11, they may withdraw a

plea before the court imposes a sentence only if they provide a "fair and just reason" for the withdrawal. Fed. R. Crim. P. 11(d)(2)(B). Rule 11 uses adjectives ("fair" and "just") that might be described as a little indefinite. *Cf. United States v. Barker*, 514 F.2d 208, 221 (D.C. Cir. 1975) (en banc). Unsurprisingly, therefore, we have held that courts must "consider the totality of the circumstances" when deciding whether a valid reason exists to jettison a plea. *United States v. Wynn*, 663 F.3d 847, 849 (6th Cir. 2011).

That said, Rule 11's historical backdrop provides useful context to channel this open-ended inquiry. The rule's text (which dates to 1983) incorporated a judicial test that courts had long followed to decide whether a defendant could withdraw a plea. *See* Advisory Committee's Notes on 1983 Amendments to Fed. R. Crim. P. 32. This precedent had adopted "guidelines" to identify what qualifies as a "fair and just" reason. *Id.*; *see United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994). As a general matter, courts recognized that a defendant's mere second thoughts about the wisdom of a knowing plea were neither "fair" nor "just" grounds to void the plea. *See United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991) (per curiam). Rather, this test was designed to cover those defendants who, despite their plea colloquies, had "hastily" pleaded guilty with an "unsure heart" and "confused mind[.]" *Id.*; *see Barker*, 514 F.2d at 222.

As a specific matter, courts identified several factors to help decide whether a defendant sought to withdraw a plea for an improper strategic reason or a legitimate misunderstanding. *See United States v. Spencer*, 836 F.2d 236, 239–40 (6th Cir. 1987). These factors included: How long did the defendant take to seek to withdraw a plea? Did the defendant offer a reason for not moving to withdraw it earlier? Has the defendant claimed to be innocent despite the earlier admission of guilt? What were the circumstances of the plea? And what was the defendant's background? *See*

*id.* Even when these factors provided a fair and just reason to invalidate a plea, courts could still deny a motion to withdraw if the withdrawal would prejudice the government. *See id.* at 240.

We have regularly relied on these traditional factors since the federal rules incorporated the fair-and-just-reason test. *See United States v. Giorgio*, 802 F.3d 845, 848–49 (6th Cir. 2015); *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008); *Bashara*, 27 F.3d at 1181; *Alexander*, 948 F.2d at 1003–04. But, as we have said in another context, "courts should not lose sight of the forest" (whether a fair and just reason exists) "for the trees (whether or how each factor applies)." *United States v. Maya*, 966 F.3d 493, 501 (6th Cir. 2020). The outcome does not rest on "simply adding up the factors and asking whether more of them favor the government or the defendant." *Id.* Rather, the factors exist to help courts distinguish withdrawal requests made for strategic reasons from those made for legitimate ones. *See Haygood*, 549 F.3d at 1052–53. So the "relevance of each factor" will depend on the facts of a particular defendant's request to withdraw. *See id.* at 1052; *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996) (per curiam).

As an appellate court, moreover, we must keep in mind that district courts bear the primary responsibility to resolve whether a defendant has identified a fair and just reason to withdraw a plea. We do not engage in a fresh inquiry into these factors. We ask only whether the district court abused its discretion when denying relief—a deferential standard of review that predates the incorporation of the fair-and-just-reason test into the federal rules. *See Haygood*, 549 F.3d at 1052; *United States v. Kirkland*, 578 F.2d 170, 172 (6th Cir. 1978) (per curiam); *cf. U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 n.3 (2018). A defendant can show that the court abused its discretion by proving that it clearly erred in a factual finding or committed a legal mistake. *Haygood*, 549 F.3d at 1052. But when the defendant challenges just the bottom-line denial of relief, we may overturn the decision only if we have "a definite and firm conviction" that

the court "committed a clear error" in its balancing of the factors. *United States v. Quinlan*, 473 F.3d 273, 278 (6th Cir. 2007) (quoting *United States v. Frost*, 914 F.2d 756, 764 (6th Cir. 1990)).

Crowe cannot overcome this deferential standard of review. We need not consider whether the government showed prejudice because the district court reasonably found that Crowe had not "hastily" pleaded guilty based on confusion about the nature of his plea. *Alexander*, 948 F.2d at 1004. For starters, Crowe waited a long time before filing his motion. He pleaded guilty on February 23, 2022, but did not move to withdraw his plea until some 170 days later on August 12. *Cf. United States v. Carpenter*, 554 F. App'x 477, 481 (6th Cir. 2014). This months-long delay shows that Crowe did not have the "swift change of heart" that could signal he entered his plea in "haste and confusion[.]" *Barker*, 514 F.2d at 222; *see Quinlan*, 473 F.3d at 277. Indeed, we have held that much shorter time gaps (two months or less) undercut any claim that the defendants hurriedly pleaded guilty and changed their minds quickly. *See Giorgio*, 802 F.3d at 848 (first citing *United States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004); then citing *United States v. Durham*, 178 F.3d 796, 798–99 (6th Cir. 1999)); *Spencer*, 836 F.2d at 239.

Next, Crowe's three reasons for waiting so long to withdraw his plea lack merit when considered against the circumstances of his plea. Reason One: Crowe claims that he learned only after he pleaded guilty that the government would object to "any *downward* departure" from his guidelines range. Mot., R.290, PageID 1266. This excuse has two problems. For one thing, the plea proceedings rebut Crowe's argument that he pleaded guilty on the mistaken belief that the government would agree to a below-guidelines sentence. Crowe pleaded guilty only after negotiating a plea agreement that gave him a substantial benefit: the government would "recommend a sentence of imprisonment at the lowest end of the applicable Guideline Range[.]" Plea Agreement, R.214, PageID 720. So he knew that the government would ask for a sentence

8

*within* that range, not *below* it. To remove all doubt, the district court required the government to confirm the terms of the agreement at Crowe's plea hearing. The government again explained that it would "recommend a sentence of imprisonment at the lowest end of the applicable guideline[.]" Plea Tr., R.297, PageID 1294. Crowe then stated that he understood the agreement's terms. *Id.*, PageID 1297. The plea colloquy thus shows that he understood the "agreed-to" recommendation "at the time of his plea." *United States v. Carson*, 32 F.4th 615, 624 (6th Cir. 2022).

For another thing, Crowe's effort to invalidate his plea because of the government's refusal to support a variance represents the kind of improper "tactical decision" that does not permit a withdrawal. *Alexander*, 948 F.2d at 1004. Defendants do not have the right to plead guilty in the hope that the sentencing process will produce a desired sentencing range and to withdraw their plea if that range does not turn out as hoped. *See, e.g.*, *United States v. Lewis*, 800 F. App'x 353, 358 (6th Cir. 2020); *Wynn*, 663 F.3d at 850. Crowe himself knew as much. The district court told him that he could not withdraw his plea even if he did not receive the sentence that he expected. Plea Tr., R.297, PageID 1293, 1298–99; *cf. Rupp*, 2023 WL 370908, at *4.

Reason Two: Crowe next argues that he pleaded guilty because the government threatened to prosecute his mother or other family members. Mot., R.290, PageID 1267. This excuse has two problems of its own. The alleged "threat" occurred before his plea. So it does not justify a six-month delay in seeking to withdraw the plea. *See Carpenter*, 554 F. App'x at 481–82. Besides, we treat a defendant's sworn statements at a plea hearing "as conclusive" unless the defendant offers "a believable, valid reason justifying a departure from the apparent truth of those statements.'" *United States v. Cinnamon*, 112 F. App'x 415, 419 (6th Cir. 2004) (per curiam) (citation omitted); *see Carson*, 32 F.4th at 624–25. And Crowe twice indicated—in his plea agreement and at the plea hearing—that nobody threatened him. Plea Agreement, R.214, PageID

9

724; Plea Tr., R.297, PageID 1298. His motion's unsworn and conclusory claim of a threat falls well short of the evidence required to undermine his sworn statements to the contrary.

Reason Three: Crowe next claims that he did not seek to withdraw his plea earlier because his relationship with his initial attorneys had "soured" only after he pleaded guilty in February 2022. Mot., R.290, PageID 1267. Yet the record discloses Crowe's displeasure with his attorneys as early as April. *See* Letter, R.226, PageID 810. But he did not move to withdraw his plea until August—only after he received the initial presentence report and the government's sentencing position. *See* PSR, R.261; Sent. Memo., R.265, PageID 1154. The district court could find this timing "suspect." *Carpenter*, 554 F. App'x at 482. And Crowe offers no reason why his troubled relationship with his initial attorneys would render his decision to plead guilty problematic.

Lastly, our remaining factors confirm that Crowe did not enter a rushed plea or lack full knowledge of its effects. Crowe, for example, has not made the kinds of "vigorous and repeated protestations of innocence" that could cause one to question the knowing nature of his plea. *Carson*, 32 F.4th at 624 (citation omitted). To the contrary, he confessed to the drug conspiracy when signing the plea agreement. Plea Agreement, R.214, PageID 717; *see Carpenter*, 554 F. App'x at 482. He confessed to it at the plea hearing. Plea Tr., R.297, PageID 1299. And he did not object to the facts of his guilt identified in his presentence report. Objections, R.312, PageID 1354. Even on appeal, he asserts his innocence in a conclusory manner without identifying any plausible "defenses" to the charges. *Spencer*, 836 F.2d at 238 (citation omitted).

Crowe's background further corroborates that he entered a knowing plea. Having racked up many adult convictions, Crowe had a criminal history category of V. PSR, R.313, PageID 1373–83. A person with this type of record will not likely misunderstand the plea process. *See United States v. Goddard*, 638 F.3d 490, 495 (6th Cir. 2011); *United States v. Pluta*, 144 F.3d 968,

974 (6th Cir. 1998). Although Crowe now argues that prosecutors had not previously charged him with an offense that could generate the "harsh sentence" that he received, Appellant's Br. 12, he does not explain why this fact matters. After all, the district court explained his sentencing exposure at the plea hearing, noting that Crowe faced a sentence of between 10 years and life. Plea Tr., R.297, PageID 1292. All told, the district court acted well within its discretion by refusing to permit Crowe to withdraw his knowing and voluntary guilty plea.

## B. Sentence

Crowe next raises three challenges to his 250-month sentence—two that our cases describe as "procedural" and one that they describe as "substantive." *See United States v. Rayyan*, 885 F.3d 436, 440, 442 (6th Cir. 2018). He argues that the district court made two mistakes in the way that it "calculate[d] his guidelines range" and that the court chose "too long" of a sentence when considering the sentencing factors in 18 U.S.C. § 3553(a). *See id.*

1. *Drug-Quantity Enhancement*. When calculating the guidelines range for Crowe's conspiracy conviction, Crowe first argues, the district court chose an excessive base offense level. To determine the base offense level for drug crimes, the Sentencing Guidelines instruct district courts to identify the quantity of drugs involved. *See* U.S.S.G. § 2D1.1(a)(5), (c). The greater the quantity, the greater the sentence. *See id.* When choosing the quantity, moreover, courts may consider all of a defendant's "[r]elevant [c]onduct" (not just the quantities "specified in the count of conviction"). *Id.* § 2D1.1 cmt. 5 (citing U.S.S.G. § 1B1.3(a)(2)). In conspiracy cases, the court may hold a defendant accountable for the drugs that coconspirators tried to distribute as long as these "acts" were "within the scope of the jointly undertaken criminal activity," "in furtherance of that" activity, and "reasonably foreseeable" to the defendant. U.S.S.G. § 1B1.3(a)(1)(B), (2); *see United States v. Tisdale*, 980 F.3d 1089, 1097 (6th Cir. 2020). The government bears the burden

11

of proving this quantity by a preponderance of the evidence. *See United States v. Warman*, 578 F.3d 320, 351 (6th Cir. 2009).

The district court held that the government proved that Crowe was accountable for the 77 pounds (or 34 kilograms) of methamphetamine seized during the stops of Slagle and Derouse. We review this finding for clear error. *See United States v. Carter*, 815 F. App'x 933, 935 (6th Cir. 2020). Under that standard, we must defer to the district court's finding even if we would have reached the contrary one, "so long as both stories are plausible on the record as a whole." *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022).

The record gave the district court a plausible basis to hold Crowe responsible for the drugs recovered during the stops of Slagle and Derouse. The court relied predominantly on the facts asserted in Crowe's presentence report. On appeal, Crowe does not take issue with its reliance on this report (rather than evidence), so we may assume that the court correctly did so. *See United States v. Bawkey*, 2022 WL 1261829, at *4 (6th Cir. Apr. 28, 2022). And the report adequately established the quantities of methamphetamine found during the stops. Lab analysis showed that the substance recovered from Slagle's vehicle contained about 17.4 kilograms of pure methamphetamine. PSR, R.313, PageID 1364. And it showed that the substance recovered from Derouse's vehicle contained about 17 kilograms of pure methamphetamine. *Id.*, PageID 1366–67.

Next, the district court reasonably held that this large amount of methamphetamine was part of the conspiracy and foreseeable to Crowe. Many statements from Crowe's coconspirators supported this factual finding. *See Tisdale*, 980 F.3d at 1097. Two examples prove this point. When pleading guilty, Derouse stated that Crowe "hired" him "into the conspiracy" and that he was "transporting a controlled substance for" Crowe when stopped with the methamphetamine. Plea Agreement, R.206, PageID 692. Likewise, Sanchez stated that he had conspired with Crowe

12

and that their conspiracy had "involved 80 pounds of actual methamphetamine," the quantity that roughly matched the drugs recovered during the two stops. Plea Agreement, R.145, PageID 429.

Under our caselaw, the district court could rely on these statements at sentencing as long as the statements had "sufficient indicia of reliability." *Carter*, 815 F. App'x at 936 (quoting *United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007)); *see, e.g.*, *United States v. Johnson*, 732 F.3d 577, 583 (6th Cir. 2013); *United States v. Currier*, 473 F. App'x 469, 472–73 (6th Cir. 2012). We have described our indicia-of-reliability test as a "relatively low hurdle." *United States v. Stout*, 599 F.3d 549, 558 (6th Cir. 2010) (citation omitted). In this case, enough evidence corroborated the coconspirators' statements to surmount this low bar. Crowe, for instance, signed the rental agreement for the car that Slagle had been driving when the police stopped him. PSR, R.313, PageID 1363. Similarly, Sanchez's phone had been communicating with Crowe's phone close to the time that the police stopped Derouse and Sanchez transporting the drugs across the country. *Id.*, PageID 1365. Lastly, Crowe admitted in his plea agreement that he had specifically conspired with, among others, Derouse. Plea Agreement, R.214, PageID 717.

Crowe responds by citing caselaw that questions the reliability of a coconspirator's statements. *See, e.g.*, *Williamson v. United States*, 512 U.S. 594, 599–601 (1994); *Lee v. Illinois*, 476 U.S. 530, 541 (1986). But these cases concerned the Sixth Amendment's Confrontation Clause or the hearsay rules in the Federal Rules of Evidence. The cases are beside the point here because neither the Confrontation Clause nor the rules of evidence applied at Crowe's sentencing. *See Currier*, 473 F. App'x at 472; *Moncivais*, 492 F.3d at 658.

Crowe also argues that the district court disregarded our caselaw requiring courts to "err on the side of caution" when choosing drug quantities. *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). He is mistaken. This cautionary instruction applies when a district court

13

must *estimate* the drug quantity because the record leaves this number unclear. *See Carter*, 815 F. App'x at 936. Here, however, the presentence report identified a *precise* quantity of drugs from the two vehicle stops. So the district court did not have to "estimate" anything. And the caution that undergirds our "estimate rule" does not extend to Crowe's different claim that his coconspirators provided unreliable statements. *Id.* (quoting *United States v. Thompson*, 588 F. App'x 449, 453 (6th Cir. 2014) (per curiam)). Besides, the district court acted with caution anyway. The court relied on only the two incidents in which the police recovered actual drugs. But plenty of evidence showed that Crowe distributed substantially more methamphetamine. The police learned, for example, that Slagle had already distributed 25 pounds of methamphetamine to Crowe before Slagle was stopped on his second trip. PSR, R.313, PageID 1363. But the court did not include this (or any other) amount. Sent. Tr., R.327, PageID 1452–53. Its cautious approach confirms that it did not commit clear error in its chosen drug quantity.

2. *Leadership Enhancement*. Crowe next contends that the district court wrongly invoked the guideline that applies to defendants with "aggravating roles" in the offense. U.S.S.G. § 3B1.1; *United States v. Warren*, 2023 WL 1961222, at *2 (6th Cir. Feb. 13, 2023). This guideline provides in relevant part: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels." U.S.S.G. § 3B1.1(a). It thus applies if the government proves two basic things. A defendant must have been an "organizer" or "leader," and the offense must have "involved five or more participants" or been "otherwise extensive." *Id.* Crowe does not dispute that his crime included at least five people, so his case turns on whether he was a "leader" or "organizer."

These words have "obvious enough" meanings. *Warren*, 2023 WL 1961222, at *3. An "organizer" "arranges" the criminal activity; a "leader" "guides others" in the activity. *Id.* (first

14

quoting 10 *Oxford English Dictionary* 924 (2d ed. 1989), then quoting 13 *Oxford English Dictionary*, *supra*, at 747). And the guideline's commentary (which both parties accept) offers more guidance still. A defendant must organize or lead another criminal "participant," not just arrange the criminal acts or control the criminal property. U.S.S.G. § 3B1.1 cmt. 2; *see United States v. Bertram*, 900 F.3d 743, 753–54 (6th Cir. 2018). The commentary also identifies several factors to consider: What was the nature of the defendant's participation and of the illegal activity? Did the defendant have a high degree of decisionmaking power and take part in the planning and organizing of the crime? Did the defendant recruit others? And did the defendant claim a larger share of the proceeds? *See* U.S.S.G. § 3B1.1 cmt. 4. Given the fact-intensive nature of this question, we afford deference to the district court's conclusion that the enhancement applies. *See Warren*, 2023 WL 1961222, at *3; *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

Here, plenty of evidence supported the district court's description of Crowe as "the kingpin in this operation." Sent. Tr., R.327, PageID 1453. For starters, several coconspirators suggested that Crowe "exercised" substantial "control" over the participants, not just the scheme. U.S.S.G. § 3B1.1 cmt. 2, 4; *see Warren*, 2023 WL 1961222, at *5. As noted, Derouse stated that Crowe "hired" him "into the conspiracy" and that he had been taking the drugs back to Kentucky for Crowe when the police stopped him. Plea Agreement, R.206, PageID 692. Another coconspirator suggested that he "collected money" from a local drug dealer "on behalf of" Crowe. Plea Agreement, R.188, PageID 627. The district court also recalled from this coconspirator's sentencing that Crowe had "recruited" him "back" to Kentucky after he tried to get away. Sent. Tr., R.327, PageID 1444. Crowe's recruitment efforts alone could have sufficed to justify his leadership enhancement. *See United States v. Castilla-Lugo*, 699 F.3d 454, 461 (6th Cir. 2012).

15

Yet other factors also justified the enhancement. The physical evidence allowed the court to conclude that Crowe had a "decision making" role in "planning" and "organizing" the drug activity. U.S.S.G. § 3B1.1 cmt. 4. He signed the rental agreement for the car that Slagle used to pick up drugs from Sanchez. And he was communicating with Sanchez about the distribution to Derouse. During his jail conversations, moreover, Crowe criticized two other coconspirators for their lack of "loyalty" to him, the type of criticism that a leader would make. PSR, R.313, PageID 1367. The district court also relied on Crowe's substantial amount of "money," which suggested he had a "larger share" of the profits. Sent. Tr., R.327, PageID 1453; U.S.S.G. § 3B1.1 cmt. 4. Crowe opined that he had enough funds to "last for 24 years[.]" Sent. Tr., R. 327, PageID 1450. Crowe also bought an expensive home, subsidized many businesses using unknown funds, and claimed to have spent extravagant amounts in Las Vegas. PSR, R.313, PageID 1363, 1367.

In response, Crowe regurgitates his argument that his coconspirators' statements were not reliable. This argument is no better the second time around. Whether or not the Confrontation Clause or Federal Rules of Evidence would have permitted the use of these statements, they had "sufficient indicia of reliability." *Carter*, 815 F. App'x at 936 (citation omitted). Our caselaw required nothing more. So the district court reasonably applied this enhancement.

3. *Substantive Reasonableness*. Crowe lastly challenges the reasonableness of his 250-month sentence, arguing that it is greater than necessary under the § 3553(a) factors. He must overcome a high bar to prove this claim. We review all substantive-reasonableness challenges deferentially, asking only whether the district court abused its discretion when choosing the sentence. *See United States v. Lynde*, 926 F.3d 275, 279 (6th Cir. 2019). In this case, moreover, the district court varied downward from Crowe's guidelines range (360 months to life imprisonment). We apply a presumption of reasonableness even to a *within*-guidelines sentence.

*See Rita v. United States*, 551 U.S. 338, 347 (2007). And this presumption grows even stronger when the defendant challenges a *below*-guidelines sentence by claiming that the district court should have been even more lenient. *See Lynde*, 926 F.3d at 279.

Crowe has not rebutted this presumption because the district court reasonably balanced the § 3553(a) factors. Most notably, it varied downward because of Crowe's "troubled" upbringing. Sent. Tr., R.327, PageID 1477; *see* 18 U.S.C. § 3553(a)(1). But it recognized that it could not go too far because society could not "tolerate" Crowe's serious misconduct: "lining up shipments of 40 pounds of meth to be brought into Bowling Green[.]" Sent. Tr., R.327, PageID 1477; *see* 18 U.S.C. § 3553(a)(1). The court also recognized that it must deter not just Crowe but also other Kentuckians who might attempt to take his place. Sent. Tr., R.327, PageID 1477; *see* 18 U.S.C. § 3553(a)(2)(B). Although Crowe "may feel that the district court's already lenient sentence was not lenient enough," its decision reasonably accounted for all relevant factors. *Lynde*, 926 F.3d at 282. That conclusion ends our inquiry under this deferential standard of review. *See United States v. Goode*, 834 F. App'x 218, 221 (6th Cir. 2020).

Crowe does not really suggest otherwise. He instead repackages his procedural-reasonableness claims. He argues that the court imposed an unreasonable sentence under the § 3553(a) factors because it "improperly" calculated his guidelines range. Appellant's Br. 29. Because the court did no such thing, his substantive-reasonableness argument fails too.

We affirm.